62 N.J. Super. 303 (1960)
162 A.2d 873
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM D. REED, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1960.
Decided June 30, 1960.
*306 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Milton N. Diamond argued the cause for plaintiff-respondent (Mr. Brendan T. Byrne, Essex County Prosecutor, and Mr. C. William Caruso, Special Legal Assistant Prosecutor of Essex County, attorneys).
Mr. Sheldon A. Weiss (assigned counsel) argued the cause for defendant-appellant.
The opinion of the court was delivered by CONFORD, J.A.D.
This is an appeal from a conviction of the defendant for unlawful possession of a narcotic drug, *307 in violation of the Uniform Narcotic Drug Law, R.S. 24:18-1 et seq., 4. Infraction of any provision of this statute, enacted by L. 1933, c. 186, is made a high misdemeanor. R.S. 24:18-47, as amended. Defendant was tried with two others who were charged with possession on the same occasion. One of them, Ophelia Wall, testified for the State, and her indictment was dismissed by consent at the conclusion of the State's case. The other, Donald D. Carey, was convicted. We are here concerned only with an appeal by Reed.
Defendant's original brief was filed pro se. Upon study of the case prior to submission this court concluded that in the interests of justice to the defendant it ought to give consideration to the question as to whether defendant's offense was in fact only such possession as was necessarily incidental to use, or imminent intended use, and as to whether, in such case, the effect of N.J.S. 2A:170-8, as amended, which proscribes "use" of a narcotic drug as disorderly conduct, with attendant lesser penalties, was not to excise possession of such qualified character from the coverage of the Uniform Act cited above. For this purpose the court assigned counsel to brief and argue that point on behalf of the defendant, and the appeal has consequently been submitted and argued on the expanded basis indicated. The work of assigned counsel has been very helpful to the court.
Insofar as concerns this defendant the State's proofs were as follows. At about 4:00 A.M. on October 27, 1958 Detectives Dougherty and MacConchie, of the Newark police, accompanied by two patrolmen, raided an apartment on the second floor of premises at 745 Hunterdon Street, Newark, on suspicion of illegal liquor and gambling activity. In a bedroom they found defendants Carey, Miss Wall and Reed, and two other persons named Florze and Wertz. They observed "an unusual amount of smoke hanging in the air." MacConchie said to the group, "This isn't cigarette smoke," but no one responded. He looked under the bed and found "one burnt butt, small, and five sticks," later proven to *308 contain the drug marijuana (spelled "marihuana" in the statute, R.S. 24:18-2(a), as amended). On a dresser alongside of which defendant and Carey were standing were "two envelopes" containing a substance later proven to be marijuana.
Defendant Ophelia Wall testified that she phoned the defendant Carey, who was her friend, at his home about 11:30 P.M. on October 26, 1958 to ask him to call for her at a bar. After a few drinks there they went to another bar, remaining until 2:00 A.M. There they met Reed, Florze and one Chinn, also known as Wabs. She knew none of them, but Carey knew Chinn. They spoke together out of her presence, and then Carey told her they were going to a birthday party at Chinn's apartment on Hunterdon Street. They all drove to 745 Hunterdon Street in Carey's car. She and Carey were in the front seat, the others in the back. As they got into the car, Carey gave her a brown package and told her to put it in her pocketbook, which she did, not knowing (she said) what was in it. Some time after they arrived at the apartment, which belonged to Chinn and one Wertz, and in which ten or more other people were congregated, drinking beer and listening to records, they went to a bedroom, where Carey asked her for the package and opened it. He told her it contained marijuana and then said to Reed, "Are we going to roll now?" At that juncture she left for the bathroom. She had not seen any rolling or smoking of the marijuana. When she returned from the bathroom she asked Carey what happened to the marijuana, and he responded, "Don't worry. I have gotten rid of it." Just then the police walked in, and the whole group, except for Reed (who had disappeared under circumstances related hereinafter), was taken to the police station. Miss Wall was searched there and marijuana was found in her bag.
Florze testified for the State. He said Reed beckoned him into the bedroom some time after he got to the apartment. He saw open marijuana envelopes and cigarette papers on *309 the dresser and smelled smoke which he implied he knew was not cigarette smoke. He asked Reed what was going on, and the latter said, "Well, nothing, you know," and he told Reed that "if [he] knew it was going to be like this," he would not have come.
Reed asked one or two of the officers during the raid whether he could go home, as he would lose his job if he did not report to work in the morning. They refused his request, but did not watch him. He walked out of the apartment and went home. The afternoon of that day the police came looking for him, but he was not at home. They came again at 2:00 A.M. the following morning. Forewarned by his wife, he ran down and hid in the basement behind a furnace, where the police found him. They brought him to headquarters and questioned him. He gave them a signed statement, which was introduced in evidence, reading, so far as material, as follows:
"I was drinking with Wabs and after closing hours he said come on down to my house and have some drinks. We all got in a car and went to Wabs' house on Hunterdon Street. We went up to his house and he gave me a can of beer and said to me, come on in this room and we can close this door. We all knew what we were going in there for. When we got in there Wabs said, or the guy that rode us over to Wabs' house said if you want to smoke, man, you roll your own. So I rolled up one and one of the other fellows said give me that one. The fellow that had his girl there rolled up his own and smoked it and his girl said I want one, too. I didn't get a chance to smoke because I was rolling them, because I didn't get a chance to smoke because the other ones wanted them. They were all smoking when the cops came in.
Question: Who is Wabs? Answer: Chinn.
Question: Who told you to roll the smokes? Answer: Chinn.
Question: Do you know who the stuff belonged to? Answer: The girl had one of the envelopes.
Question: How do you know? Answer: Her boy friend, the one who rode us over to Chinn's house, whispered to her and she handed him the envelope.
Question: Who was smoking the Marijuana when I walked into the room? Answer: The girl and her boy friend were and the guy that was there when we got there.
*310 Question: Who did the stuff belong to that was being smoked in the front room? Answer: Either the girl or her boy friend.
Question: How do you know? Answer: I saw the guy whisper to her and she took the brown package out of her purse and gave it to her boy friend.
Question: Do you know the girl and boy friend? Answer: I don't know their name, but I would know them if I saw them again."
Defendant Reed's motion to dismiss as to him at the conclusion of the State's case, on the ground that the evidence did not warrant a finding of possession of marijuana on his part, was denied.
Defendant testified that he was beaten by the police in the basement of his home when apprehended and at the police station. His wife gave corroboratory testimony on this point. He said he did not give the police most of the information set forth in the statement but signed it to keep from getting hurt. He specifically denied having related to the police that portion of the statement to the effect that "We all knew what we were going in there for." He admitted he did tell the police that someone in the room had said to him, "If you want to smoke you roll your own."
Defendant testified that he met Chinn at the bar and was invited to the latter's apartment for a birthday party. His story as to the trip from the bar to Hunterdon Street was essentially the same as Miss Wall's. He confirmed that Carey gave Miss Wall a brown package in the car, but he did not know what was in it. He neither saw, rolled nor smoked any marijuana that night.
His wife told him the next evening that the police had been looking for him in the afternoon, but he wanted to get a lawyer before seeing them. The police testified in rebuttal of defendant's claim of coercion in getting the statement, denying there was any violence.
A motion by defendant for dismissal at the end of the case was denied.

*311 I.
We deal first with several contentions raised in defendant's pro se brief.
A point is made as to the illegality of the search of defendant's home. However, no question was raised as to this at the trial, and no connection appears between that search and any evidence adduced at the trial against him. It would make no difference if there were. Eleuteri v. Richman, 26 N.J. 506 (1958).
As to the claim of coercion and violence in respect to the obtaining of the statement attributed to defendant, the transcript shows that his counsel examined it and expressly stated he had no objection to its admission. Moreover, the trial court correctly charged the jury that in passing upon the credibility and weight to be accorded the confession they should consider the evidence touching the voluntary or involuntary character of it and the circumstances under which it was given. See State v. Smith and Stanford, 32 N.J. 501 (1960).
Objection is raised for the first time  none was offered by defendant at the trial  to the court's charge to the jury that they might find from the testimony that the circumstances under which defendant left the apartment at Hunterdon Street, and hid from the police the next day, constituted flight; and that if they so concluded, and were not satisfied with defendant's explanation, they might draw therefrom an inference of guilt. A preferable form of charge is that unexplained flight is a circumstance tending to prove a consciousness of guilt, State v. Petrolia, 45 N.J. Super. 230, 234 (App. Div. 1957), certification denied 25 N.J. 43 (1957). The charge here given, however, cannot be regarded as plain error, if erroneous at all. See the discussion in the opinion just cited. It will be noted that the rule as to flight extends also to unexplained concealment or analogous conduct. 20 Am. Jur., Evidence, § 293, p. 274.
*312 Defendant's pro se brief lays main stress on the contention that there was insufficient evidence of the "corpus delicti" of the crime of possession aside from the confession. However, as noted in State v. Campisi, 42 N.J. Super. 138, 145 (App. Div. 1956), reversed on other grounds 23 N.J. 513 (1957), "full proof of the body of the crime is not required in addition to the confession, but sufficient proof thereof may arise out of the evidence corroborating some fact * * * in the confession itself." There was corroborating evidence sufficient to enable the jury to infer that defendant had had possession of marijuana at least to the extent of handling it while rolling cigarettes made of the drug. This made the confession fully admissible, and it clearly furnishes a substantial evidential basis for a finding of possession, constructive as well as actual, either being sufficient to show possession. State v. Campisi, supra. Cf. State v. Williams, 9 N.J. Misc. 106 (Sup. Ct. 1931).

II.
We arrive at the more challenging aspect of the appeal  that which we asked to have briefed and argued by counsel specially assigned to defendant. N.J.S. 2A:170-8, as amended, provides that "any person who uses a narcotic drug" as defined in the Uniform Narcotic Drug Law, for a purpose other than treatment as prescribed by a qualified person, is a disorderly person and punishable accordingly. Since it is obvious that self-use of a drug logically implicates possession by the user at least for a limited period, the question arises whether the Legislature did not intend by the adoption of the statute just cited subsequent to the enactment of the Uniform Narcotic Drug Law to eliminate from the more drastic scope of the latter act such limited possession as necessarily attends the use made punishable only as disorderly conduct by N.J.S. 2A:170-8. If the answer is in the affirmative, the interests of justice dictate a new trial, since a jury might find that the possession by *313 the defendant in the present case, if any, was only such as was necessarily incidental to imminent or actual personal use by him. Since, as we shall enlarge upon later, the jury might as well, from the proofs, find possession of the drug by defendant for the additional purpose of purveying it to others, or in connection therewith, which would transcend possession necessarily incidental to personal use, the jury could either convict or acquit the defendant on the foregoing hypothesis as to the law, arising out of the proposed reconciliation of the interaction of the possession and use statutes. But upon acceptance of such a legal theory of qualified liability for possession under the Uniform Act, the case would have to be retried in order that the question of defendant's guilt be submitted to a jury upon a charge comprehensive of that theory, as was, of course, not done below, the point not having been raised.
Upon full study of the legislative history of the statutes referred to and of the evolving public policy relating to punishment of offenders in narcotics cases the conclusion is inescapable that the enactment of the Disorderly Conduct Act provisions was intended to constrict the scope of the possession punishable under the Uniform Act. The over-all legislative purpose is (1) to impose severe, long-term penalties, under R.S. 24:18-47, as amended, upon narcotics traffickers, and those whose dealings with or possession of narcotics conduces to illegal distribution and use, and (2) to impose short-term, rehabilitation-oriented sentences, under N.J.S. 2A:170-8, upon those who use but do not deal in or otherwise handle narcotics illegally.
The first disorderly persons statute dealing with the subject of narcotics use was enacted in 1948, and merely amended the act to add, without further definition, the term "common drug addicts" to a long list of other categories of "disorderly" persons such as "common" drunkards, thieves, burglars, pick-pockets, prostitutes, procurers and night-walkers. L. 1948, c. 135 (R.S. 2:202-3). The statement annexed to the legislative bill declares its purpose to be *314 "to aid in the control of common drug addicts who are a danger both to themselves and to the public." By L. 1951, c. 330, "a common drug addict" was defined as one who "habitually uses" narcotic drugs. However, if the accused could show that he obtained the drugs lawfully from an authorized physician, he would escape conviction.
In the revision of Title 2, R.S. 2:203-2 became N.J.S. 2A:170-8, effective January 1, 1952 (L. 1951, c. 344). The revision effected major changes. First, N.J.S. 2A:170-8 deals exclusively with narcotics, the multifarious other "commons," etc., being either dropped or dealt with in other sections. Second, the appellation, "common drug addict," and the requirement of habitual use were discarded, and the statute instead read:
"Any person who uses a narcotic drug [as defined in Food and Drug Act] * * * for a purpose other than the treatment of sickness or injury as prescribed or administered by a person duly authorized by law to treat sick and injured human beings, is a disorderly person." (Emphasis added)
N.J.S. 2A:170-8 has since been amended only once. By L. 1957, c. 109, being "under the influence of" a narcotic drug was also made disorderly conduct, and the following paragraph was added to the statute:
"In a prosecution under this chapter, it shall not be necessary for the State to prove that the accused did use or was under the influence of any specific narcotic drug or drugs, but it shall be sufficient for a conviction under this chapter for the State to prove that the accused did use or was under the influence of some narcotic drug or drugs as defined in article 1 of chapter 18 of Title 24 of the Revised Statutes (Food and Drugs) by proving that the accused did manifest physical and physiological symptoms or reactions caused by the use of any narcotic drug."
The amendment of 1957 was sponsored by the New Jersey Commission on Narcotics Control (hereinafter "N.J. Commission"), a permanent commission appointed pursuant to L. 1953, 1st Spec. Sess., c. 449 (N.J.S.A. 24:20-1 et seq.). *315 The purpose of the amendment is twofold. With respect to the above-quoted paragraph, the amendment "eliminates the superfluous defining of narcotic drugs in the present law which tends to reduce its effectiveness." 3rd Report, N.J. Commission, p. 52 (1957) (cf. State v. Campisi, 23 N.J. 513 (1957)).
The stated purpose of adding the phrase, "under the influence of," was to authorize the conviction of persons under the influence of narcotics "regardless of whether the drug was obtained and/or used in a State other than New Jersey." Id. at p. 53. See also, 1st Report, N.J. Commission, p. 11 (1955), where the Commission advocated that the statute as it then existed be amended in order to overcome the "loophole" which protected a person arrested in New Jersey who used a drug in a bordering state. But the actual effect of the amendment is patently much broader. It expressly permits the conviction for disorderly conduct of a person who takes a narcotic even if not apprehended actually using the drug as long as he exhibits the symptoms or reactions of narcotic use.
The legislative placing of drug addiction, and, later, drug use, within the milder punitive sphere of disorderly conduct offenses was accompanied by a stiffening of the legislative and public attitude toward punishment of dealers, dealer-users and other illegal handlers of narcotics under the Uniform Act. The penalty provisions of that act, R.S. 24:18-47, have been vastly increased. Originally R.S. 24:18-47 merely provided that violations of the act were punishable as high misdemeanors, i.e., a maximum of seven years' imprisonment. In 1951 the first provision for severe minimum penalties was enacted. L. 1951, c. 56 amended the Uniform Act to provide for the following jail terms: first offense, two to five years; second offense, five to ten years; subsequent offenses, ten to twenty years. The amendment further provided, in addition to imprisonment, for a fine of not more than $2,000. This legislation was originally initiated by Governor Driscoll. The Governor's Cabinet Committee on *316 the Sale and Use of Narcotics recommended this measure to stamp out narcotic "traffickers." See the Committee's Report, April 10, 1951, pp. 2, 4. That the Committee did not intend the increased penalties to apply to users who did not traffic in drugs clearly appears from page 4 of the Report, wherein the problem of drug users is separately discussed in terms of disorderly conduct. Moreover, the Governor, upon submitting the proposal to the Legislature, stated that the purpose of the measure was to provide minimum penalties for drug "peddlers." See Newark Evening News, April 12, 1951, p. 6.
Thereafter, the Legislature, by Joint Resolution No. 8, dated May 22, 1951, created a temporary commission to study the existing narcotics laws "dealing with the sale, dispensation and distribution" of narcotics, and to determine what changes in the existing laws were deemed necessary. The Commission, after extensive hearings, proposed several new laws as well as amendments to the existing legislation. See "Report of Study and Recommendations," Leg. Comm. to Study Narcotics (2d ed., March 22, 1952). One of the proposals was to amend R.S. 24:18-47 again and increase the maximum penalties thereunder to 15 years, 25 years and life imprisonment, for first, second and subsequent offenses, respectively. See Report, op. cit., supra, p. 98. This proposal was adopted as recommended. L. 1952, c. 90. Another measure recommended by the Commission and adopted by the Legislature prohibited the courts from suspending sentences and granting probation in all cases of violation of the Uniform Act except as to first offenders. L. 1952, c. 267, p. 914 (amending N.J.S. 2A:168-1).
While these amendments do not in terms distinguish between possession for distribution and possession by the ultimate user, it is clear that the severe penalties imposed thereunder were not intended to be inflicted upon the ultimate consumer of narcotics. The Report of the Commission states (p. 20):
*317 "N.J.S. 2A:170-8 makes drug addiction a nonindictable offense under the Disorderly Persons Act with the offender liable for a jail term not exceeding one year or a fine, or both. The penalty is adequate for a user, since an individual in this category needs care and treatment rather than incarceration. The sentencing magistrate may (and we believe should) put the offender on probation upon condition that he will submit to approved treatment. Zealously enforced, this law is a splendid means of getting the addict off the streets where he can contaminate others, and into an institution for care, treatment and possible cure."
This legislative pattern is not peculiar to New Jersey. Other jurisdictions have similarly recognized the need for differentiating between traffickers and users of narcotics. Our neighboring states of New York and Pennsylvania similarly provide for lesser penalties in the case of users, by differentiating between possession generally and possession for personal use. See N.Y. Penal Law, §§ 1751, 1751-a; Pa. Stat. Ann., tit. 35, § 865 (1953). Indeed, the courts of both states have declared it to be the policy of their states to prevent the use of narcotics by charging the seller or trafficker with the serious crime rather than the "victim" or ultimate consumer. See, e.g., People v. Pasquarello, 282 App. Div. 405, 123 N.Y.S.2d 98 (1953), affirmed 306 N.Y. 759, 118 N.E.2d 361 (1954); Commonwealth v. Warner, 87 Pa. Dist. & Co. R. 91 (Ct. Quar. Sess. 1954).
That the purpose of placing punishment for addiction or use within the category of disorderly conduct was to enhance the chances of rehabilitation of such persons has been recognized by our courts. Thus, in State v. Campisi, supra, the Supreme Court alluded to the "laudable purpose of the State to rehabilitate such unfortunate persons * * *" by means of prosecution of use under N.J.S. 2A:170-8 (23 N.J., at p. 519). Accord: State v. Cruz, 15 N.J. Super. 577, 581-582 (Cty. Ct. 1951)
Early narcotics legislation, including the Uniform State Drug Law and the federal forerunner, the Harrison Act, 38 Stat. 785 (1914), 26 U.S.C. § 2550 et seq. (1946), contained no distinct provisions with respect to drug users *318 as contrasted with manufacturers and traffickers. Use of and addiction to narcotics were not made criminal offenses. As a practical matter, however, users of drugs were dealt with in the same manner as dealers  both could be and were repeatedly convicted as "possessors" of narcotics, both under R.S. 24:18-4 and under the federal legislation. See King, "The Narcotics Bureau," 62 Yale L.J. 736 (1953).
The "dope fiend" and drug "peddler" were subject to the same public loathing and abhorrence. See King, op. cit., supra, pp. 737-738; Clausen, "Social and Psychological Factors in Narcotics Addiction," 22 Law & Contemp. Prob. 34 (1957). But with the growth of more informed and humane thought and writing on the subject, it has generally been accepted that the non-peddling users of drugs, as opposed to sellers and peddlers, are not arch criminals but basically sick and unfortunate people in need of assistance, not long-term incarceration. Thus legislators and the public alike have gradually come to realize the injustice and impolicy of imposing stiff penalties on the ultimate consumer of narcotics, the relatively recent wave of anti-narcotics sentiment being primarily concerned, from a penal point of view, with drug traffickers.
As Justice Gassman, of the Court of Special Sessions, New York City, has stated in "Problem of Drug Addiction," 6 Crim. L. Rev. (N.Y.) 17, 23 (1959):
"There should be no sympathy for the seller, who is nothing more than a black marketeer. However, when we speak of the drug `user,' the problem is an entirely different one."
Moreover, the conception of the addict as a sick person rather than a criminal has been accepted by the medical profession and his non-criminality is almost taken for granted in most of the critical writing on the subject. See, e.g., "Symposium on Narcotics," 22 Law & Contemp. Prob. 1, 10, 82-83, 118 (1957); Note: "Narcotics Regulation," 62 Yale L.J., 751, 778 (1953); Gassman, "The Problem of *319 Drug Addiction," op. cit., supra. In the last-cited article, Justice Gassman, commenting on the present inadequacies of current methods of dealing with narcotics addicts, stated:
"We look upon the addict as a criminal, which he is not , rather than a health problem  which he is." (6 Crim. L. Rev. (N.Y.), at p. 22.)
For examples of the rehabilitation-orientation of "user" legislation in other states, see Ex parte Levinson, 160 Tex. Cr. R. 606, 274 S.W.2d 76 (Ct. Crim. App. 1956); Andrews v. Commonwealth, 312 Ky. 677, 229 S.W.2d 311 (Ct. App. 1950).
It follows from the foregoing that the legislative intent and policy in making the simple use of narcotics disorderly conduct would be subverted if any behavior of the user integral to such use could also be treated by the law enforcement authorities and punished as a high misdemeanor, with the attendant severe and mandatory penalties attached thereto. Use of narcotics is, of course, impossible without possession, at least during the brief time of actual self-administration. Giving reasonably realistic scope to the separate legislative punishment-classification of use would also require subsumption under that classification of possession solely for the purpose of imminent use, as users almost always have possession for at least a brief period prior to actual use (we consider later the problem of possession with intent to use at a time more remote than imminently).
The question is not whether "possession" and "use" are separate and distinct offenses. Obviously, one can possess a drug without using it. But one cannot ordinarily use it without possessing it. Common sense dictates that once the Legislature has chosen to make such a significant distinction between the relative culpability of the two acts and has treated the use of drugs, without more, as a disorderly persons offense, it follows that such possession of the drug as is necessarily incidental to its use cannot reasonably be regarded as intended to constitute an independent criminal *320 act, punishable in a vastly more serious manner than the use of the drug itself.
This instant situation is thus a manifest example of a clearly intended constriction of the permissible scope of the former statute (R.S. 24:18-4) as a necessary incident of the enactment of the later one (N.J.S. 2A:170-8).
We are not aided in reaching a solution of this problem in terms of presumptions against repeal by implication, as contended by the State. The Legislature did not intend by adoption of the Disorderly Persons Act provisions to repeal any part of the Uniform Act. Its language remained intact. But what was of necessity intended by the adoption of the later act was its exclusive application to the area of conduct comprehended therein  and this although previously embraced in part by the former act. This conclusion is born of the justified assumption that the Legislature must have intended both enactments to co-exist, each operative within its intended sphere, ascertainable from inspection of legislative language and objectives. See State v. Hotel Bar Foods, 18 N.J. 115, 128, 129 (1955); Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 223-225 (1960); cf. State v. Roberts, 21 N.J. 552 (1956). "If the provisions of the later and prior acts are reconcilable, effect must be given to both in their respective spheres," French v. Ocean City, 136 N.J.L. 57, 60 (Sup. Ct. 1947). See Note, "Repeal by Implication," 55 Colum. L. Rev. 1039, 1046-1049 (1955), for a discussion of the importance of policy factors, generally, in cases of "implied repeal," with special reference to the instant problem  the co-existence of two criminal statutes imposing different penalties for the same conduct; see also Comment, 10 Rutgers L. Rev. 462 (1955).
On the basis of the foregoing considerations we are impelled to hold that such possession of narcotics as is either inseparable from actual use thereof by the accused, or solely of a nature necessarily incidental to imminent actual use by him, is removed from the scope of punishable possession under the Uniform Act. Our coverage of possession *321 incidental to use within the intended exclusion is forced by the consideration that otherwise, where a user has come into possession of narcotics solely for the purpose of, and shortly prior to use (the typical user situation), he could be punished both for the use under the Disorderly Persons Act and for the prior possession under the Uniform Act, thereby plainly offending the legislative policy discussed above that one who is solely a user should be dealt with for such use only under the milder statute.
Beyond contending that the intention of the Legislature is that where there is possession attendant upon use both the use and the possession remain punishable under the respective penal statutes involved, the State's principal reliance is upon the decision of the Essex County Court in State v. Cruz, 15 N.J. Super. 577 (Cty. Ct. 1951). At the time of that ruling the Disorderly Persons Act (then R.S. 2:202-3) extended, as above noted, to "common drug addicts," rather than to simple use, or being under the influence of any narcotic drug, as today. The defendants, who had been apprehended while getting ready to take a portion of heroin, admitted using drugs a number of times over a period of several months. They pleaded guilty and were sentenced as common drug addicts under the Disorderly Persons Act. Thereupon they were charged with possession under the Uniform Act. They attacked the accusation on the ground, among others, that the amendment to the Disorderly Persons Act necessarily repealed the penalization under the Uniform Act of such personal possession as was incidental to addiction. The court rejected the argument, but by reasoning, which, with all deference, we cannot find persuasive. It said (at pp. 581, 582): "The disorderly persons provisions are clearly reconcilable with the State Drug Act. The obvious purpose of the Disorderly Persons Act is to provide a simple effective method for the conviction and rehabilitation of those who have unfortunately become addicted to narcotics." With both of these statements, as this opinion makes evident, we agree. But we cannot perceive *322 in them a logical basis for the court's conclusion that possession necessarily incidental to and physically comprehended by the offense of addiction remained punishable under the Uniform Act notwithstanding that the addiction itself was punishable only under the Disorderly Persons Act. Rather, indeed, to the contrary.
To be distinguished is the recent decision in State v. Puckett, A-98-59 (App. Div. 1960), unreported, where defendants were apprehended driving an automobile in which was secreted a quantity of heroin and of the apparatus for its use. The defendants gave the police a statement that they had used some of the heroin when they acquired it the day before in New York. The court held that a prosecution for possession under R.S. 24:18-4 was not precluded on grounds of double jeopardy by the circumstance of a prior conviction for being a user of narcotics under N.J.S. 2A:170-8. The point under discussion in the instant case was there neither raised nor considered. Moreover, the result there is entirely consistent with our rationale here. The possession of narcotics in the Puckett case was not necessarily integral to the specific use for which defendants had been convicted as constituting disorderly conduct. That possession (presumably while riding in the car) was, moreover, not necessarily incidental to imminent personal use.
The evidence in the case at hand, outlined above, is such that a jury instructed in consonance with our construction of the law, as stated above, might find the defendant Reed either guilty or innocent of possession under the Uniform Act. On the one hand, assuming a finding of any possession by defendant at all, such possession might be found from the proofs to have been solely for the purpose of imminent use by the defendant himself. In such case an acquittal would be called for. If, however, as might also be found by a jury, defendant's possession was for the purpose of making or assisting in making the marijuana available to others, whether or not also for personal use, he remains within the punitive ambit of the Uniform Act. The legislative *323 policy for the protection of the user from prosecution for possession as a high misdemeanor does not extend to the dealer-user, a large and dangerous category of narcotics offenders. Possession of narcotics by any unauthorized person is always a potential fulcrum for their illegal sale, distribution or use. It is, therefore, particularly in the light of the growing public policy for stamping out the unlawful and socially cancerous distribution and use of narcotics, incumbent upon the courts not to relax the applicability of the sanction against possession under the Uniform Act a whit beyond what inexorable logic and the settled legislative policy for dealing with users exclusively under the Disorderly Persons Act require. Consequently, possession which is not solely incidental to actual or imminent personal use, but also for the purpose of making the drug available for others, or for the purpose of personal use at some time more remote than imminently, remains punishable under the Uniform Act.
Reversed and remanded for a new trial.