83 N.J. Super. 345 (1964)
199 A.2d 860
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ARCADIO GARCIA, A/K/A ARCADIO M. GARCIA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 13, 1964.
Decided April 27, 1964.
*347 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Albert L. Cohn argued the cause for appellant (Messrs. David & Albert L. Cohn, attorneys; Mr. Daniel Crystal, on the brief).
Mr. Archibald Kreiger, Assistant Prosecutor, argued the cause for respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The Passaic County grand jury returned an indictment in two counts charging defendant with carnal abuse of L, a 14-year-old girl, in violation of N.J.S. 2A:138-1. The first count charged the offense was committed on October 5, 1961 and the second count charged an offense in November 1961. A jury trial resulted in a verdict of guilty on the first count and not guilty on the second. The County Court judge imposed a State Prison sentence of 3-5 years. On this appeal defendant contends that (1) the trial court erred in denying his motion for judgment of acquittal at the end of the State's case and in not setting the verdict aside as against the weight of the evidence; (2) plain error by the trial court in permitting the jury to consider the doctrine of assenting silence as probative of guilt; (3) plain error in the court's failure to caution the jury with respect to the inherent weakness of the doctrine of assenting silence; and (4) plain error in failing to charge the jury that it might draw an unfavorable inference against the State because it did not call certain witnesses.
Defendant had from time to time lived with L's mother in Paterson and was called "stepfather" by her children. L testified *348 that on October 5, 1961 she and a younger brother rode with defendant from their home to his store, where he was to give them some groceries for the house. The three descended to a cellar where defendant said the groceries were kept. He then sent the boy upstairs, held a knife to the girl's throat, ordered her to disrobe, and had sexual relations with her. They then rejoined the boy, who had been waiting upstairs for 15 to 25 minutes. The girl had been crying and her eyes were red. To make sure her mother would not suspect anything, defendant drove L and her brother around for a while before taking them home. The girl further testified that she did not tell her mother of what had happened for several months because she was in fear of defendant. She said that sometime in November 1961  she could not fix the date  defendant again took her to the same cellar and again carnally abused her.
L's pregnancy came to light in February 1962. On March 13 an older brother lodged a complaint against defendant with the Paterson police. The girl gave the police a statement the next day, in the course of which she said there had been two occasions when defendant sexually abused her, the first on August 4, 1961 and the second on February 23, 1962. Defendant was present when this statement was given, but remained silent throughout.
The indictments, as noted, charged defendant with carnal abuse on October 5, 1961 and in November 1961. To explain the discrepancy in dates, L testified that "at that time I didn't know my months in Spanish so good, and my mother told me it was on August, and I don't know what month in English, so I told that month and when I got home my mother told me I told the wrong month because it was supposed to be October, because I didn't know my months in Spanish and she told me in Spanish." She insisted, however, that the correct date of the first incident was October 5, 1961, and the second had happened in November.
Defendant asserts that L changed her mind about the dates and testified that the acts in question took place on October 5 *349 and in November 1961 in order to conform to the fact that her child was born on July 18, 1962. That birth, he says, proved that she had had relations with some male, but not necessarily with him. In his testimony defendant suggested that the complaint lodged with the police on March 13, 1962 was in order to "get even" with him because of an argument he had had with the girl's mother the day before.

I.
Defendant asks that we reverse the conviction because the trial judge wrongly denied his motion for judgment of acquittal at the close of the State's case. R.R. 3:7-6 provides that
"* * * The court, on motion of a defendant or of its own motion, shall order the entry of judgment of acquittal * * * at the close of the State's case or after the evidence of both sides has closed, if the evidence is insufficient to warrant a conviction. * * *"
The test to be applied on a motion made at the close of the State's case is whether the evidence before the trial court, viewed in its entirety and giving the State the benefit of all legitimate inferences reasonably to be drawn therefrom, was such that the jury could properly find, beyond a reasonable doubt, that defendant was guilty of the crime charged. State v. Fiorello, 36 N.J. 80, 90 (1961). It is not required that the State's proofs exclude every reasonable hypothesis except that of guilt. State v. Graziani, 60 N.J. Super. 1, 13 (App. Div. 1959), affirmed 31 N.J. 538 (1960), certiorari denied 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960). Our review of the record convinces us that the evidence adduced by the State established a prima facie case, requiring defendant to present his defense.
Defendant's argument under this point proceeds on the mistaken assumption that corroborative evidence of the victim's testimony was legally required. It is clear that in our jurisdiction a conviction for a morals or sex offense may *350 be sustained on the uncorroborated testimony of the victim. State v. Fleckenstein, 60 N.J. Super. 399, 405 (App. Div. 1960), certification denied 33 N.J. 109 (1960). Moreover, it appears that in the absence of statute the law elsewhere is generally in accord. 7 Wigmore on Evidence (3d ed. 1940), § 2061, p. 342; Annotation, 60 A.L.R. 1124, 1125 (1929).
Despite defendant's assertion that the State's case rested solely on the girl's uncorroborated testimony, there were, in fact, other elements of proof pointing toward guilt. There was the testimony of Sergeant Moore, the officer who took defendant into custody for investigation on March 13, 1962, who said that defendant started to flee when approached by him. (When defendant took the stand he denied that he ran.) Although defendant stopped after taking a few steps, the circumstance was some evidence, however slim, tending to prove a consciousness of guilt. Cf. State v. Petrolia, 45 N.J. Super. 230 (App. Div. 1957). Of similar effect was the testimony of L's brother that defendant hid when the police came to the apartment. Cf. State v. Reed, 62 N.J. Super. 303, 311 (App. Div. 1960), reversed on other grounds 34 N.J. 554 (1961).
Defendant points to several inconsistencies in the girl's testimony which, it is claimed, renders her testimony suspect. First, there was the question of the dates of the offenses, already referred to. Next, the girl testified that she became pregnant as a result of the October 5, 1961 incident, and that this occurred at a time when she was experiencing her menstrual period. Defendant argues that the child could not have been conceived at such time. (It is appropriate to observe at this point that the instant litigation is not a bastardy proceeding. It is not material that the baby was sired at another time or by another man. The question which the jury had to determine was whether defendant carnally abused the girl on October 5, 1961 and again in November 1961.) And finally, defendant contends that the girl's testimony is suspect because she failed to make any accusation against defendant for a period of several months, and that no complaint was *351 made until after there had been a serious argument between defendant and her mother.
The short answer to these alleged deficiencies in the State's case is that it was for the jury to determine where the truth lay. It was free to believe or disbelieve the girl's explanation about the dates, or that she was taken advantage of while experiencing her period; and it was for the jury to appraise the delay in bringing a complaint. Cf. State v. Welsch, 29 N.J. 152, 155 (1959).
The trial court, then, was correct in denying defendant's motion for judgment of acquittal at the close of the State's case. As for his claim that the verdict should have been set aside as contrary to the weight of the evidence, we note that the defense made no such motion. But even had such a request been made, the trial judge would have been entirely correct in denying it, in light of R.R. 3:7-6 and what we have said as to the motion made at the close of the State's case.
Defendant would have us reverse the conviction on the ground that it was against the weight of the evidence. Here the provisions of R.R. 1:5-1(a), made applicable to this court by R.R. 2:5, come into play. The verdict of a jury may not be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion. That test is not met under the facts here present. As long as a verdict rests upon testimony competent to sustain the inference implied in such a finding, it is ordinarily conclusive upon us. As has repeatedly been said, our review upon appeal is aimed only at correcting injustice resulting from obvious failure of the jury to perform its function. State v. Haines, 18 N.J. 550, 565 (1955); State v. Welsch, above, 29 N.J., at pages 155-156. Defendant has not shown that the jury failed to do so, or that it ignored the evidence and rendered its verdict on the basis of mistake, partiality, prejudice or passion  as against his claim that he received "a raw deal." On the contrary, the jury displayed a reasoned judgment and a careful *352 consideration of the evidence when it returned a verdict of not guilty on the second count charging carnal abuse in November 1961, because the evidence under that charge was vague and indefinite, in contrast to that given in support of the first count.

II.
Defendant claims that the court committed reversible error when it failed to charge the jury that it might draw an unfavorable inference against the State for its failure to call the girl's older brother or her mother to the stand. The defense concedes that no request to so charge was made. In such circumstances a defendant may not avail himself of a failure to charge where the point raised is not fundamental to the case.
Defendant's argument here is, in essence, a variation on his earlier theme of corroboration. As we have said, the rule obtaining in our courts is that corroboration of a victim's testimony is not legally essential to a conviction. We perceive no prejudicial error in the failure to charge as to the nonproduction of the two witnesses.

III.
We come, then, to the real point of the case, which is that the trial court committed plain error in permitting the jury to consider the doctrine of assenting silence as probative of guilt. Defendant's brief launches a broadside attack against that doctrine.
The doctrine of assenting silence, first authoritatively projected in the leading case of Donnelly v. State, 26 N.J.L. 601, 612 et seq. (E. & A. 1857), has in the recent past undergone considerable attenuation. Following the relatively uncritical acceptance of the doctrine in State v. Picciotti, 12 N.J. 205, 209 (1953), and State v. Landeros, 20 N.J. 76, 84 (1955), came State v. Kobylarz, 44 N.J. Super. 250 (App. Div. 1957), certification denied 24 N.J. 548 (1957). Judge *353 Jayne there discussed the doctrine at some length. He rather clearly indicated his dissatisfaction with the assumptions regarding human nature which are said to support the doctrine, and the fairly rigid application given it by courts of this and other jurisdictions.
The doctrine of assenting silence, as defined in Donnelly, is out of touch with what the behavioristic sciences have taught us in recent years. One theory upon which the doctrine rests is that failure to deny an accusation may be taken as a tacit admission of the fact stated. A second theory would have it that whether the accused intended to admit the statement or not, his failure to deny was behavior manifesting a consciousness of guilt of the particular crime. McCormick on Evidence, § 247(b), p. 258 (1954); 4 Wigmore on Evidence (3d ed. 1940), § 1071, p. 70, and § 1072(6) (a), p. 89; Model Code of Evidence, Rule 507, comment (b), p. 247 (1942); Report of the New Jersey Supreme Court Committee on Evidence, pp. 163-164 (1963); Brody, "Admissions Implied From Silence, Evasion and Equivocation in Massachusetts Criminal Cases," 42 B.U.L. Rev. 46, 47-48 (1962).
As Hilles, in his excellent and very comprehensive treatment of the entire subject, points out in his article, "Tacit Criminal Admissions," 112 U. Pa. L. Rev. 210 (1963), these theories "have not been empirically tested, but rest solely upon intuitive concepts of normal human conduct." See Miller v. United States, 116 U.S. App. D.C. 45, 320 F.2d 767, 773, n. 13 (1963), where Chief Judge Bazelon quotes the statement of Mr. Justice Frankfurter in the Report of the Royal Commission on Capital Punishment, p. 102 (1949-1953); Commonwealth v. Vallone, 347 Pa. 419, 425, 32 A.2d 889, 892 (Sup. Ct. 1943) (Maxey, C.J., dissenting). Although some authorities have expressed the consciousness of guilt theory as the more preferable of the two, an accused may manifest guilt feelings, not as to the particular accusation leveled against him, but from a general sense of guilt, or from guilt of another crime, as Chief Judge Bazelon pointed out in Miller. And see Hutchins and Schlesinger, "Some Observations *354 on the Law of Evidence  Consciousness of Guilt," 77 U. Pa. L. Rev. 725, 737 (1929). As Judge Jayne put it in Kobylarz, "human emotions and impulses constitute an erratic and unstable pedestal upon which to perpetuate a rule of law. We observe today that so many accused persons deliberately recognize safety in silence and are more interested in protection from eventual prosecution and conviction than in preliminary protestations of innocence."
The uncertainty which attends interpreting an accused's silence as an implied admission of the statement made, or as exhibiting a consciousness of guilt, has led courts to consider such evidence as dangerous and to be received with caution. See, for example, People v. Kennedy, 164 N.Y. 449, 456-7, 58 N.E. 652, 654 (Ct. App. 1900); People v. Nitti, 312 Ill. 73, 91, 143 N.E. 448, 454-5 (Sup. Ct. 1924) (alternative holding); see also the quotation from the charge in Kobylarz, above, 44 N.J. Super., at page 261.
Recognizing that the doctrine of assenting silence "at its best brings about the weakest assumption known to the law," People v. Todaro, 256 Mich. 427, 435, 240 N.W. 90, 93 (Sup. Ct. 1932) (dissenting opinion), courts generally have imposed conditions upon the introduction of evidence that an alleged admission by silence has occurred. Thus, it was said in Kobylarz, above, 44 N.J. Super., at page 259, that to constitute proof of an admission by silence, the evidence must disclose that (1) the statement was extra-judicial; (2) it was incriminatory or accusative in import; (3) it was one to which an innocent man would in the situation and surrounding circumstances naturally respond; (4) it was uttered in the presence and hearing of the accused; (5) he was capable of understanding the incriminatory meaning of the statement; and (6) he was at liberty to deny or reply thereto. And see Hilles, op. cit., at page 213, and notes 26 through 30.
Judge Jayne readily acknowledged in Kobylarz that the doctrine of assenting silence has been rejected by many courts of the highest credit. However, he considered it settled in this jurisdiction that evidence of a defendant's silence should *355 not necessarily be excluded merely because, at the time he was confronted with the accusative statment, he was in the custody of police officers, citing State v. Landeros, above, 20 N.J. 76, the then most recent expression of our highest court.
In 1960 Justice Jacobs, writing for the Supreme Court in State v. Butler, 32 N.J. 166, 181-2, recognized that authorities throughout the country have divided on the issue of whether courts should admit evidence of a defendant's silence in the face of an accusatory statement made while he was under arrest or in custody. Despite the fact that the principle first stated in State v. Donnelly, above (1857), had repeatedly been applied by our courts in such circumstances, Justice Jacobs observed that "such application has recently been brought into serious question."
It has been pointed out that the police are not entirely unaware of the uses to which the doctrine can be put. It is said that it is not uncommon for enforcement officers to accuse one under arrest or in their custody, or to confront him with his accusing victim or with the inculpatory confession of an alleged accomplice, in the hope that this may prompt a confession or a tacit admission by silence. If the accused stands mute, he runs the risk that the prosecution may seek to have testimony regarding his silence introduced at the trial to establish a tacit admission. See Report of the New Jersey Supreme Court Committee on Evidence, above, loc. cit.; Hilles, op. cit., at page 234 et seq., and notes 152-154.
Application of the doctrine of assenting silence presents considerations of a more serious nature when the so-called tacit admission is made in the presence of the police who have the defendant in custody or under arrest. As Hilles observes:
"* * * Evidence of an admission by silence forces the defendant tactically to elect between his right not to testify at trial and the obvious need to explain his reaction to the accusation, thus indirectly affecting his privilege against self-incrimination. This type of evidence also raises a more direct self-incrimination issue to the extent that one purpose of that privilege is to prevent the silence of an accused in the presence of authorities from being used against him at trial." (112 U. Pa. L. Rev., at page 214) *356 And see his elaboration of this point at pages 247-251, and the discussion of the possible application of the due process clause of the Fourteenth Amendment, at pages 251-2.
In the light of the probative weakness of silence and the possibility that such silence in the presence of police authorities results from fear or from a belief in a right of silence or the wisdom of silence, and further, because of considerations of fundamental constitutional importance, a number of courts have adopted the rule (first expressed by Chief Justice Shaw in Commonwealth v. Kenney, 53 Mass. 235 (Sup. Jud. Ct. 1847)) that the arrest or taking into police custody of an accused in itself excludes evidence of a subsequent admission by silence. Commentators generally favoring this rule are Brody, op. cit., 42 B.U.L. Rev., note 257, at pages 48-49; Heller, "Admissions by Acquiescence," 15 U. Miami L. Rev. 161, 173, note 99 (1960); Note, 40 Minn. L. Rev. 598, 607 (1956); Comment, 6 U.C.L.A. Rev. 593, 601-2 (1959); "Developments in the Law  Evidence," 46 Harv. L. Rev. 1138, 1162-3 (1933). Hilles lists 12 jurisdictions as accepting the rule; 20 have rejected it; 6 have reserved the question (New Jersey apparently belongs in this category by reason of State v. Butler, above), and 12 have no clear position. And in the federal system he notes that 5 circuits have accepted the rule, 1 rejected it, 1 reserved the question, and 4 (among them the Third Circuit) have not decided the issue. Op. cit., at pages 253-5.
We have discussed the doctrine of assenting silence generally as a frame of reference within which the more particular factual pattern of the present appeal falls. The recent past has witnessed a reawakened interest in criminal law and criminal procedure. Courts are taking a fresh look at old doctrines, and this one, like the rule which permits a jury to make an inference of guilt from the failure of a defendant to take the stand, invites judicial reexamination.
Were we at liberty to do so, we would reverse the conviction under appeal by applying the enlightened rule which so many jurisdictions have embraced. We are constrained by the fact *357 that our highest court has not yet completely abrogated the principle of State v. Donnelly in a situation like the present one. However, what Justice Jacobs said in State v. Butler would appear to point in the direction of the position taken by some of the highest courts in the country.
It is possible to resolve the question before us within the four corners of what was said in the Kobylarz case. The court there held that
"* * * where an accused is in the custody of the police at a relatively formal meeting deliberately arranged and attended by officers hostile to him and there faced with the incriminatory accusations, the circumstances amid which he remains silent should be shown to be such that no explanation of his silence is reasonable other than his acquiescence in the truth of the accusations." (44 N.J. Super., at page 259)
Kobylarz was favorably cited, and the quoted language emphasized, by Justice Jacobs in State v. Butler, above, 32 N.J., at page 184.
Defendant was taken into custody on the evening of March 13, 1962 by Sergeant Moore of the Paterson police, who told him he was being taken to headquarters for investigation. Detective Sergeant Lynch was assigned to the case the next day and spoke to defendant shortly after 9 A.M. The following portion of his testimony is significant:
"Q. And what was the first thing that you did in connection with this investigation? A. I questioned the defendant regarding the accusations made by [L].
Q. And what, if anything, did he say? A. He denied them and refused to say anything further regarding the investigation.
Q. And what happened after that? A. A short time thereafter we took a Statement from [L]. By `we' I mean myself and Sergeant Blackman in the presence of defendant." (Italics ours)
L's statement was taken in question and answer form, and typed out in the policewomen's office at headquarters. Present were Lynch, Police Woman Sergeant Edwards (formerly Blackman), L, defendant, and the girl's older brother. Defendant sat within close range as Lynch put the questions and *358 L gave her answers. Defendant understood and spoke English. He said nothing during the taking of this statment and no one had advised him to participate or not participate in the proceedings. When defendant was asked to sign L's statement merely as a witness, he refused to do so.
Knowing all this, the prosecuting attorney should never have introduced evidence regarding the statement and defendant's silence. Instead, he first had Sergeant Edwards relate all the circumstances surrounding the making of the statement and defendant's silence. He then called Sergeant Lynch to the witness stand, and it was only then that the testimony about defendant's earlier denial of the accusations and his refusal to say anything further about the matter came out. The trial judge should then and there  whether there was formal objection or not  have refused to permit any evidence regarding L's statement and defendant's silence. He should also have directed the jury, in the clearest language he could summon, to ignore any such testimony as may have been given before Lynch took the stand. He did neither.
Most courts have excluded all such evidence where the accused, then in police custody or under arrest, initially denied the accusation and then remained silent when subsequently confronted by the person making the accusatory statement. People v. Collins, 234 N.Y. 355, 364-5, 137 N.E. 753, 757 (Ct. App. 1922), and State v. Dills, 208 N.C. 313, 180 S.E. 571 (Sup. Ct. 1935), both alternative holdings; Commonwealth v. Mazarella, 279 Pa. 465, 124 A. 163 (Sup. Ct. 1924) (apparently ignored by the Pennsylvania Superior Court in later cases, such as Commonwealth v. Dodson, 174 Pa. Super. 421, 101 A.2d 411 (1953)). They have said that an accused is not likely to "continue to shout his denial," People v. Nitti, above, 312 Ill. 73, 93, 143 N.E. 448, 455 (Sup. Ct. 1924), or that "it may well be that having denied his guilt on the previous occasion * * * he thought it useless to continue to do so," People v. Bennett, 413 Ill. 601, 609, 110 N.E.2d 175, 178 (Sup. Ct. 1953).
*359 It was reversible error to permit the testimony in question to be received in evidence. That error was magnified by subsequent developments at the trial. The prosecutor stressed the assenting silence in his summation, and the judge in his charge dwelt on the implied admission, leaving it for the jury to determine the applicability of the doctrine  after giving the jury the six conditions laid down by Kobylarz.
The judgment of conviction must be reversed and the case remanded for a new trial.