98 N.J. Super. 430 (1968)
237 A.2d 630
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM SIMMONS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1967.
Decided January 8, 1968.
*433 Before Judges KILKENNY, CARTON and CRAHAY.
Mr. Mark D. Larner for appellant (Mr. Martin G. Picillo, attorney).
Mr. Lawrence S. Schwartz, Assistant Prosecutor, for respondent (Mr. Brendan T. Byrne, Prosecutor of Essex County, attorney).
The opinion of the court was delivered by KILKENNY, J.A.D.
Defendant was found guilty by a jury in the County Court of entry with intent to commit rape, in violation of N.J.S. 2A:94-1, and rape of a 16-year-old deaf-mute girl, in violation of N.J.S. 2A: 138-1. He was sentenced by the trial judge to State Prison for a term of not less than two nor more than four years for each offense, the sentences to run consecutively. Defendant appeals from the judgments of conviction.

I
Defendant's first contention is that the trial court erred in determining in the presence of the jury the victim's competency to testify. Argument is made that her lack of competency to testify had been determined by the same trial judge at a previous trial of this same indictment. At that time the jury had failed to reach an agreement, thus necessitating the second trial. Defendant maintained at the inception of the later trial that the trial judge should take judicial notice of his prior ruling on her lack of competency and avoid prejudice by not having her presented to the jury for a redetermination of her competency.
*434 In State v. Butler, 27 N.J. 560, 603 (1958), it was held that the trial judge has jurisdiction to conduct a preliminary inquiry to determine the competency of a witness to testify.
"The hearing may be conducted in or out of the presence of the jury in the discretion of the court. It may be desirable to take the testimony in the presence of the jury because, assuming a finding of competency to testify, ordinarily the evidence is relevant on the subject of the credibility of the witness." (at p. 604)
In the instant case the preliminary inquiry resulted in a reaffirmance by the trial judge of this deaf-mute's lack of competency to testify. Her intelligence was deemed by her teacher to be that of a seven-year-old, first-grade pupil. She was able to communicate in a limited way as to concrete subjects, but not as to abstract ideas. Defendant does not question the propriety of the trial court's ruling that she was not competent to testify.
We find no abuse or mistaken exercise of the trial judge's discretion in conducting the preliminary inquiry in the presence of the jury in this case. The determination of a lack of competency on a prior occasion does not per se preclude a finding of competency at a later date. Moreover, the same reasons which prompted the inquiry in the jury's presence at the first trial may properly exist at the second trial. If competency is found, the inquiry in the jury's presence may aid in assessing credibility. If the victim is not produced, the nonproduction may invite all kinds of speculation. For these reasons, the law wisely leaves the matter to the discretion of the trial judge. We find no reversible error as to this phase of the case.

II
The next argument advanced is that the trial court committed error in permitting testimony of the victim's out-of-court identification of the defendant. A brief summary of *435 the factual background is necessary to put this issue in proper focus.
The victim of the alleged rape was at the time thereof, December 6, 1965, a 16-year-old deaf-mute. At about 11 o'clock that night this young girl and her younger brother Jerry, six years old, were in bed in their respective bedrooms of the family apartment in Newark. Another brother Larry, 15 years old, was sitting in the living room watching television. Their mother was out at some store.
Larry testified that he heard a noise in the kitchen of the apartment and went to investigate. He saw a man standing in a small hallway of the apartment "by the kitchen." He identified that man in the courtroom at the trial as defendant. Larry testified further that the man told him that "if I hollered he was going to shoot me." He had a gun, the size of a police gun and with a white pearl handle, and pointed it at Larry. He was close enough for Larry to get a good clear look at his face. Larry was "too scared" to do other than what the man ordered him to do. In Larry's words:
"He told me turn around and he put the gun up in my back and told me to get into the front room and sit on the chair and not to move."
Larry knew the man by reason of having seen him on prior occasions "hanging together" with his uncle.
The intruder, identified by Larry as defendant, then went into his sister's bedroom, holding the gun in his hand as he did so. Larry heard his sister "holler" or "screech," something she could do despite her impediment in speaking. Defendant remained in his sister's bedroom for about half an hour to an hour. When he came out of the room "he ran out the back," that is, out an open back door which had been locked before this incident. Larry went into his sister's bedroom. He testified to her state of undress and his sister's pointing down "to her privacy."
*436 The mother came in shortly thereafter. Larry told her what had happened. The mother instructed him to go downstairs and phone the police. When they came he related the details to the police. Larry did not know the name of the intruder and Larry's uncle, who did know him, was then in jail for some minor offense. But Larry told the police that one Robert Harris would know the name and residence of the attacker. He went with the police to the home of Harris. When the boy described the man, Harris immediately responded with defendant's name and furnished the police with his address. Larry and the police then went to defendant's home and were freely admitted by defendant's mother. When they entered the house, defendant ran to a back room, as the mother informed them. The police found defendant hiding in a closet. Larry there and then identified him, as he testified at the trial, as the man who had been in his family's apartment earlier that same evening. Defendant thereupon shook his head and said, "Not me, not me."
The police then took Larry and defendant to Newark City Hospital where the victim had meanwhile been taken for examination. Defendant was brought into the room where the girl was sitting. She was asked if this was the man who had come into the house and raped her. As Larry expressed it:
"She pointed down to her privacy and she pointed at the man and she shook her head."
It is this identification of defendant by the victim at the city hospital, which the trial court permitted her brother Larry and the police then present to testify to, that defendant alleges constituted reversible error. Obviously, the ruling by the trial judge, that the victim was not competent to testify, precluded her personal identification of defendant at trial as the wrongdoer.
*437 Defendant argues that permitting others to testify to her out-of-court identification was error because: (1) extra-judicial identifications are admissible for the sole limited purpose of corroborating a witness's identification of defendant at trial; (2) prior identification must be made under circumstances which reasonably preclude suspicion of unfairness or unreliability; (3) the trial court's finding of the victim's incompetency precluded the introduction of prior statements by her; (4) the hearsay character of the testimony required rejection thereof, and (5) her nod of the head and gestures were nothing more than "sheer speculation" as to what she meant thereby.
The girl did not testify. Obviously, therefore, this is not a situation involving a prior out-of-court identification by a witness to support an in-court identification by that same witness. Rather, the testimony by the police officers as to what the victim did when she was confronted by the alleged ravisher, who had already been identified by her brother as the perpetrator of the crimes, was properly admissible on other broader grounds. It constituted a link in the chain of circumstantial evidence implicating defendant. The police had been summoned and appeared at the scene of the crimes within a matter of minutes after their occurrence. They were relatively in "hot pursuit" of the intruder who had ravished a 16-year-old girl. Prompted by the ancient doctrine of "the hue and the cry," they proceeded to apprehend defendant hidden in a closet at his home. The confrontation immediately thereafter at the city hospital was but another step in the police routine. Such confrontations are common everyday procedures, not only to lend support to a criminal charge against a suspect but also to avoid an unwarranted accusation, if the victim absolves the person presented.
The girl's identification was made in this case under circumstances which reasonably precluded suspicion of unfairness or unreliability. The question was addressed to her by her mother who, presumably, had many years of experience *438 in making herself understood by her daughter. The mother was deceased at the time of trial. The police understood the mother's question. The daughter's nod of the head, her pointing to where she had been violated, and her accusing finger directed toward defendant, fairly indicated her answer. The close proximity in time between the attack and confrontation insures a fresh memory. Under the circumstances, we find no unfairness in the lack of a lineup.
The mere fact that the trial judge found this deaf-mute, possessed of the intelligence of a seven-year-old first grader, incompetent to testify because of her inability to express herself as to abstract ideas, does not preclude her pointing an accusatory finger. In State v. Claymonst, 96 N.J.L. 1 (Sup. Ct. 1921), defendant was convicted of carnal abuse of a four-year-old girl. The trial court allowed witnesses to testify that defendant was brought to the girl's bed in the city hospital and there she identified defendant as the man who had attacked her. Even though she was deemed incompetent to testify at the trial because she was too young, her identifying statement was deemed to be of sufficient reliability to warrant testimony thereof, since the statement was made in defendant's presence. Here, too, the identification was made in defendant's presence and in response to the mother's question.
Mere incompetency to testify does not bar the identifying statement. See, too, State v. Lambertino, 13 N.J. Misc. 687, 180 A. 426 (Sup. Ct. 1935), where the police were permitted to testify to an identifying statement by the victim of an atrocious assault and battery, the victim having died before trial and thus unavailable to testify. That case is analogous to the facts herein. After all, defendant does not dispute that the girl made the identification under the circumstances related by those who were present and in his presence.
Defendant argues that the victim's nod of the head and gestures produced "mere speculation" as to what she *439 meant thereby. We do not agree. The probative weight of this testimony was for the jury.

III
Defendant next argues that testimony as to his remaining silent in the face of the identifications prejudiced him. Reliance is placed on State v. Ripa, 45 N.J. 199, 204 (1965), wherein the court concluded that when a defendant expressly refuses to answer an accusation made in his presence, "no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept."
In the first place, defendant did deny the accusation by declaring "not me, not me," when he was first identified. Secondly, the trial judge expressly instructed the jury:
"Under our law a defendant upon arrest is under no duty to say anything. Moreover, our law gives him an absolute right not to say anything upon his arrest. I therefore instruct you that you are to draw no inference from the defendant's failure to speak upon his arrest or deny his guilt."
This instruction is in accord with the rule in State v. Ripa, supra.

IV
Claim is made that the trial court interfered with the trial of the case to the prejudice of defendant.
We have read the entire transcript of the trial and especially the particular portions of the record referred to by defendant. We are satisfied that there was no undue or improper interference by the trial judge. Where the trial judge did intervene, the interventions were not an abuse or mistaken exercise of the trial court's discretion as defined by our courts. See State v. Ray, 43 N.J. 19 (1964); State v. Guido, 40 N.J. 191, 207 (1963); State v. Riley, 28 N.J. 188, 200 (1958). The State's principal witness was a young boy. Judicial intervention was proper to clarify *440 his testimony. The trial judge's interrogation of the examining physician was necessary for the jury's understanding of the medical testimony. There was no excessive intervention in this case by the trial judge by extensive questions, as in State v. Ray, supra; nor any untoward judicial conduct, as in State v. Homer, 86 N.J. Super. 351 (App. Div. 1965).

V
Defendant maintains that the verdict was against the weight of the evidence.
On the contrary, there was ample credible evidence from which the jury could find beyond a reasonable doubt, as it did, that defendant committed the crimes charged against him. A verdict of a jury may not be set aside as against the weight of the evidence unless it clearly appears that the verdict was the result of partiality, prejudice, passion or mistake. State v. Garcia, 83 N.J. Super. 345, 351 (App. Div. 1964). The record does not demonstrate any of such infirmities in this case. No useful purpose would be served by detailing the evidence supportive of the verdict.

VI
The next point advanced is that the cumulation of errors requires that the judgment of conviction be reversed.
We find no such cumulation of errors in this case to warrant application of the cumulative error rule.

VII
Defendant's final claim is that there could not be a conviction on both entry with intent to rape and rape, and, therefore, the consecutive sentences were improper.
State v. Byra, 128 N.J.L. 429 (Sup. Ct. 1942), affirmed o.b. 129 N.J.L. 384 (E. & A. 1943), certiorari denied 324 U.S. 884, 65 S.Ct. 1025, 89 L.Ed. 1434 (1944), is dispositive of this claim. In that case, convictions for breaking *441 and entering with intent to commit grand larceny and for the consequential grand larceny were upheld, as were the consecutive sentences imposed. To the same effect, see State v. Quatro, 44 N.J. Super. 120 (App. Div. 1957), certiorari denied 355 U.S. 850, 78 S.Ct. 73, 2 L.Ed.2d 60 (1957).
This case is not to be confused with State v. Riley, 28 N.J. 188 (1958), where the crime of assault with intent to commit rape was deemed to be merged in the rape itself, thus requiring only a single punishment. Here, the entry is a separate and distinct offense from the subsequent rape.
Defendant cites Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), but a reading thereof will indicate that the decision is based on an interpretation of the Federal Bank Robbery Act and, as the court itself states, is "peculiar to the statute" and must be differentiated from similar problems in this general field raised under other statutes.
Finding no valid basis for reversal in any of the grounds advanced by defendant, the judgments of conviction are affirmed.