**Louis R. HUTCHERSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18375.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 21, 1964.

Decided March 18, 1965.

Petition for Rehearing en Banc Denied May 6, 1965.

Bazelon, Chief Judge, dissented in part.

Mr. Aloysius B. McCabe (appointed by this court), Washington, D. C., for appellant.

Mr. Gerald E. Gilbert, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker and Joseph A. Lowther, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and BURGER, Circuit Judge.

WILBUR K. MILLER, Senior Circuit Judge.

Louis R. Hutcherson was taken into custody September 12, 1963, for a misdemeanor committed in the presence of the arresting officer.[1] It was immediately discovered that he had on his person a vial containing 28 capsules of heroin hydrochloride not in or from the original stamped package, whereupon the officer arrested him on a narcotics charge. An indictment returned October 28, 1963, accused Hutcherson of violating two sections of the narcotics statutes.[2] He filed a motion to suppress the evidence of the arresting officer as to the 28 capsules on the theory that the narcotics officer was really looking for contraband drugs and made a sham arrest for a minor unrelated misdemeanor merely to have a pretext for searching his person for narcotics; that the search was therefore illegal.

At a pre-trial hearing on the motion to suppress, the arresting officer and the appellant testified, after which Chief Judge McGuire denied the motion. The case came on for trial in December, 1963, at which the motion to suppress was renewed and again denied. Thomas Didone, the arresting officer, testified substantially as he did at the pre-trial hearing on the motion to suppress and a Government chemist identified the contents of the capsules as heroin hydrochloride; the appellant did not testify and introduced no witnesses.

After the jury had found him guilty under both counts of the indictment, the Government showed he had twice before been sentenced for narcotics violations. Following this, the trial judge imposed as to each count the minimum sentence of ten years fixed by statute, but directed that they run concurrently. Hutcherson appeals.

His first point is that the trial court erred in denying his motion to suppress the evidence of Didone concerning the 28 capsules of heroin. His theory is that,

1. Drinking in a public alley. Section 25-128, D.C.CODE (1961), is in part as follows:

   "(a) No person shall in the District of Columbia drink any alcoholic beverage in any street, alley, park, or parking * * *."

2. 26 U.S.C. § 4704(a), which is as follows:

   "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found."

   and 21 U.S.C. § 174, which is as follows:

   "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

   "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

as the officer was a member of the narcotics squad and was patroling an area known to be frequented by traffickers in illegal drugs, it follows that his purpose was to search appellant for narcotics and that the arrest on a misdemeanor charge was merely a pretext for the subsequent search. He argues that narcotics officers do not ordinarily arrest people for drinking in public.

■ Although the arresting officer was attached to the narcotics squad, that assignment did not restrict him to narcotics work and did not detract from his general authority as a member of the Metropolitan Police Department. He had statutory authority to arrest without a warrant any person committing an offense in his presence or within his view.[3]

The officer's uncontradicted testimony showed he observed Hutcherson drinking from a wine bottle in an alley just before he was taken into custody. The subsequent search of appellant was the usual routine weapon search, and in this case the officer was fortified by the fact that appellant admitted he had a weapon on his person. This appears from Didone's testimony.

"A. We were—Detective Seibert and I—he was driving and we were in the detective cruiser going north, in the vicinity of Fourteenth and V Streets, Northwest, in Washington, D. C. I observed the defendant and another man standing on the corner of Fourteenth and V Streets. That would be the southwest corner. There is a Big Boy Restaurant there. I didn't recognize them as to who they were. I just saw them. We proceeded north and they turned into V Street.

*　*　*　*　*　*

"As we proceeded a distance into V street we came to an alley that ran perpendicular to the fourteen hundred block of V Street and in that alley I observed the defendant and this other individual.

"As Detective Seibert turned into the alley I observed the defendant bringing a small bottle up to his mouth and drink from it, and we proceeded down the alley as he was drinking.

"As we came abreast of the defendant Detective Seibert stopped the car and at that time the defendant was taking the bottle down and topping it.

"I was in the rider's seat. We stopped by the defendant who was standing on the west side of the alley by a little ridge. He was about two feet from me. I could see the bottle said Thunderbird Wine and he smelled of wine.

"I said Police, and showed my badge. At that time the other person was standing a few feet from him. I asked the defendant if he knew it was a violation of law to drink in public. He said yes. I said, 'You know it is a violation of the law to drink in public?' He said yes.

"I then left the cruiser, got out of the cruiser, and placed the defendant under arrest and advised him he was under arrest for drinking in public.

"Afterwards I asked the defendant if he had a knife or any weapon on him. He was facing me. As he said yes, he turned his body slightly toward the right and with his left hand, slipped it under his shirt. His

---

3. Section 4–140, D.C.Code (1961), is as follows:

"The several members of the police force shall have power and authority to immediately arrest, without warrant, and to take into custody any person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace or offense directly prohibited by Act of Congress, or by any law or ordinance in force in the District, but such member of the police force shall immediately, and without delay, upon such arrest, convey in person such offender before the proper court, that he may be dealt with according to law."

shirt was outside of his pants and he slipped his left hand underneath his shirt. As he did that I grabbed his forearm and said, 'I'll get it.' I then withdrew his forearm and lifted his shirt up.

"When I lifted his shirt up I observed his undershorts had elastic and they were pulled up about two or three inches from his pants and I felt for a knife in there. As I felt, I felt a lump and I removed it. It was a small clear glass bottle containing a quantity of white powder."

The situation thus disclosed is quite unlike that in White v. United States, 106 U.S.App.D.C. 246, 271 F.2d 829 (1959), cited by the appellant, where a divided court held that the search of one arrested for vagrancy was illegal because the officer had no warrant and no probable cause for making the arrest. Here there is no doubt of probable cause, as the offense was committed in the officer's view.

The appellant refers to Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961), in which it was held that the Fourth Amendment was violated where an arrest for a minor traffic violation was used as a pretext for a search for marijuana cigarettes; then he likens this case to that one by saying, "Here, too, the Government's evidence was obtained as a result of an arrest for a minor and unrelated misdemeanor used as an obvious pretext to search for suspected narcotics." In the *Taglavore* case, it plainly appeared that the officers deliberately planned the arrest as a pretext for searching for marijuana which they believed the defendant had in his possession. Here, there was no such factual situation. The unplanned arrest was fully justified, and the search was warranted not only by the arrest but also by Hutcherson's admission that he had

a weapon which he seemed to be about to reach for under his clothing.

Hutcherson's next contention is that he was denied due process because he was indicted and convicted under federal statutes instead of under the D.C. Code.[4] His point is that the offenses denounced by the federal and local statutes are identical and that he was entitled to be prosecuted under the latter because the penalty for violating it is less severe than that provided by the federal statute. The theory is untenable. A defendant has no constitutional right to elect which of two applicable statutes shall be the basis of his indictment and prosecution. That choice is to be made by the United States Attorney. This was aptly stated by the Fifth Circuit in Deutsch v. Aderhold, Warden, 80 F.2d 677, 678 (1935):

"The United States attorney of the district where a violation of a federal statute occurs is charged with the duty of prosecution and vested with complete control over the proceedings, in the exercise of sound discretion. If the facts show a violation of two or more statutes, he may elect under which he will prosecute, in the absence of a prohibitory statute. * * *"

Appellant's final reason for reversal is that a ten-year sentence in this case constitutes cruel and unusual punishment under the Eighth Amendment. This argument is so obviously unsound that detailed discussion is unnecessary. As the Supreme Court said in Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

" * * * The plain meaning of the provision [the Narcotics Act] is that each offense is subject to the penalty prescribed; and, if that be too harsh, the remedy must be afforded by act of Congress, not by

---

4. Section 33–402, D.C.Code (1961), is in pertinent part as follows:

"(a) It shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any nar-

cotic drug, except as authorized in this chapter."

One who violates this provision a second time may receive a sentence of imprisonment for ten years.

judicial legislation under the guise of construction. * * *"

In this connection, it is noted that Hutcherson's punishment could lawfully have been imprisonment for twenty years, had the trial judge made the two sentences consecutive instead of concurrent.

Affirmed.

BURGER, Circuit Judge (concurring):

I agree entirely with Judge Miller's treatment of the sham-arrest issue. It would be the ultimate in absurdity to let a defendant be heard to complain that a police officer specially trained in narcotics law enforcement can make arrests only for narcotics violations, or for judges otherwise to question an officer's motives for his official actions. See, e. g., Mellon v. Brewer, 57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519 (1927). When a police officer observes overt criminal conduct and makes an arrest, the fact that the officer suspects other violations not manifest at the time, such as illegal possession of narcotics, weapons or stolen goods, is totally irrelevant. The police officer would himself have been guilty of a misdemeanor had he failed to arrest appellant in these circumstances. D.C.CODE ANN. § 4–143 (1961).[1] To suggest that an accused is not foreclosed from questioning an officer's personal motives for making an arrest, otherwise valid, is simply to say that the first amendment protects the right of every appellant to make any contention, however absurd or bizarre. The alarming frequency with which judges accept such contentions tends to encourage this exercise. Other issues presented in this case seem to be to warrant somewhat fuller treatment, especially in light of the sweeping generalities of the dissent.

I note at the outset that the longstanding practice of this court by which one sitting division adheres to prior holdings of other divisions precludes our entertaining the arguments advanced in the dissent, to say nothing of making a holding to those ends. Our *holding* in Castle v. United States, No. 17894, Nov. 19, 1964, 120 U.S.App.D.C. ——, 347 F.2d 492, apart from the dictum, of necessity rejected the cruel-and-unusual-punishment contention now made by appellant and in Lloyd v. United States, No. 18049, July 3, 1964, 119 U.S.App.D.C. ——, 343 F.2d 242, petition for rehearing en banc denied, Nov. 6, 1964, we rejected both that contention and the equal-protection contention. Since the *Lloyd* case was decided without opinion and the *Castle* case dealt but summarily with the cruel-and-unusual-punishment claim, an elaboration may be useful.

(1) Appellant has no standing to raise the equal-protection question here. The sentence of ten years is the minimum penalty for the repeat-offender under the federal statutes in question. Under the applicable provisions of the D.C.CODE, the maximum penalty for such offenders is ten years plus a fine of $5000. It is apparent that appellant could thus lawfully have received an even heavier penalty under the D.C.CODE than he received under the federal statutes, and we cannot assume he would have received *less* than the same ten-year sentence, without fine, had he been tried under the DISTRICT CODE. In these circumstances, appellant is not a "person aggrieved" by the United States Attorney's choice of statute. See Berra v. United States, 351 U.S. 131, 133, 76 S.Ct. 685, 100 L.Ed. 1013 (1956)

---

1. As Judge Miller's quotation from the Record makes plain, the arresting officer's search was made for the purpose of disarming appellant of the knife he had admitted carrying. As the Supreme Court only recently had occasion to say, "Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons * * *." Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). Given the valid purpose of search for a weapon, any other aims the officer may have had are irrelevant. That the valid search disclosed possession of contraband drugs was appellant's misfortune.

(Court found appellant's sentence greater than maximum possible under statute appellant asserted should have been charged as lesser offense before reaching merits of that contention).

(2) Assuming *arguendo* that appellant had standing to raise the equal-protection issue, I find his position without merit, even if we assume that the equal-protection guarantee may be imported into the fifth-amendment due process clause in this situation. In the *Berra* case, *supra*, the situation presented to the Supreme Court was very similar to the instant case. There the petitioner had been tried and sentenced under 26 U.S.C. § 145 (b), which the Supreme Court assumed punished as a felony the same acts made a misdemeanor by 26 U.S.C. § 3616(a).[2] At trial petitioner had moved unsuccessfully to have the jury instructed on § 3616(a) as a "lesser offense." He had made no motions addressed to the validity of the indictment, conviction or sentence under § 145(b). In this posture, the Supreme Court found the propriety of the denial of the lesser-offense charge to be the only question before it, 351 U.S. at 134, 76 S.Ct. 685, thus rejecting the dissenting view of Justice Black that the co-existence of the felony and misdemeanor statutes vested a discretion in the prosecutor "wholly incompatible with our system of justice," *id.* at 138, 76 S.Ct. at 690, and that the Court should notice that fact as "plain error" under Rule 52(b) of the Federal Rules of Criminal Procedure. *Id.* at 137, 76 S.Ct. 685.[3]

Thus, the *Berra* case precludes our finding plain error warranting reversal here despite the fact that the federal and municipal statutes in question may be viewed as "functionally equivalent," in that they require identical proof.[4] Appellant's attempt to distinguish cases such as Deutsch v. Aderhold, 80 F.2d 677 (5th Cir. 1935), as upholding the prosecutor's discretion to choose only between statutes requiring proof of different facts are thus to no avail.

Moreover, it is clear that a United States Attorney has the discretion to proceed against a particular defendant under the federal legislation or to allow him to be dealt with by a *state* having concurrent jurisdiction. Indeed, a defendant may constitutionally be prosecuted for the same acts both by the United States and by any state whose laws those acts offend. Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. People of State of Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed. 2d 684 (1959). We need not decide whether Congress acted for a sovereignty separate from that it serves in national legislation when it passed the Uniform Narcotics Act for the District of Columbia; we need not decide whether the United States Attorney for the District of Columbia, viewed functionally as both a state and a federal entity, could validly prosecute a defendant *both* under the D.C.CODE and under the federal statutes. In my view it is sufficient to say there is no substantial difference between allowing the United States Attorney for the District of Columbia to proceed either under the municipal or the federal legislation in his discretion and allowing his

2. The force of *Berra* for our purposes is of course not diminished by the Court's subsequent determination, see Achilli v. United States, 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918 (1957), that the two sections did not in fact overlap.

3. If it be suggested that the grant of certiorari on the refusal of the lesser-offense charge precluded the Court from considering the plain-error claim argued by Justice Black, the answer is to be found in the Court's usual approach of reaching whatever it wishes to reach. If any error was thought to exist, there can be no doubt that the vehement dissent of Justice Black called the question to the Court's attention. Accord, United States v. Achilli, 234 F.2d 797, 809 (7th Cir. 1956).

4. D.C.CODE ANN. § 33–402 (1961) punishes possession of narcotics; 21 U.S.C. § 174 and 26 U.S.C. § 4704(a), on the other hand, punish certain *acts* relating to the handling of narcotics. The municipal and federal statutes are functionally equivalent however, since the latter authorize conviction on proof of unexplained possession.

counterpart in a state to bring a federal action or to defer to state authorities.[5] To draw such a distinction would be to sanction the kind of hairsplitting judicial sophistries that undermine rather than advance a rational and fair administration of the criminal law.

(3) The contention that appellant's sentence is cruel and unusual punishment is similarly without merit.[6] Justice White noted in dissent in Robinson v. State of California, 370 U.S. 660, 689, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), that the Court's use of the eighth amendment in that case was novel since the Court used that amendment substantively. What the Supreme Court struck down in Robinson was not the punishment as such but rather the act of a state legislature in declaring the condition of narcotics addiction itself a crime.[7] It is not the role of this court to extend such a strained use of the cruel-and-unusual-punishment clause in the face of the Supreme Court's intimation in Robinson itself that the clause is not to be so extended. See 370 U.S. at 664–666, 82 S.Ct. 1417. Nor should that Court be put to the necessity of granting review in order to reject expressly a holding it has so recently rejected by implication.

Even if I thought it open to us—as I do not—to ignore the intimations of the Supreme Court that its use of the cruel-and-unusual-punishment clause in Robinson does not extend to forbid punishment of possession of narcotics, I should reject such a use on its merits. The Robinson determination that addiction per se may not be made a crime articulated a general substantive rule of law, which does not turn on the nature of each addict's drug habit; rather it was a broad institutional determination. In contrast, the determination whether a particular defendant's possession of narcotics came about at a particular time and place and in such circumstances as to make any punishment therefor cruel and unusual presumably would require a complex factual determination of the subjective motives of the person as well as his capacity to control his conduct. It would thus be an individual determination, going only to the constitutionality of the incarceration of that particular defendant. How, then, is it possible to separate the cruel-and-unusual-punishment issue in such a case from the "insanity" issue? In my view the proper procedure is for the accused to raise the issue of "insanity" grounded on addiction before the trier of fact by "some evidence" that he has some mental illness apart from addiction or that addiction to and long or intensive use of narcotics have eroded and impaired his capacity to control his conduct.[8] It is inappropriate to ask an appellate court to hold as a matter of law that the punish-

5. The functions of a prosecutor afford examples of a wide variety of powers to "select" the punishment in the sense argued by appellant, and to select the forum. One is seen in the situation where the prosecutor in one jurisdiction elects to yield prosecution of an accused for an offense to a jurisdiction which has capital punishment not available in the waiving jurisdiction. Similarly a prosecutor may elect to prosecute or not to prosecute, or to indict for greater rather than lesser included offenses on facts which reasonably support either. The record before us shows that the Attorney General has promulgated standards for the guidance of United States Attorneys in the exercise of their discretion in narcotics prosecutions. United States Attorneys' Manual Title 2 (Crim.Div.) § 86.2.

6. It is so if for no other reason than that appellant has made no showing that addiction compelled his possession of the 28 capsules. If we are to voyage outside the record as does Judge Bazelon, it might be fitting to note that one of appellant's prior convictions was for sale of narcotics.

7. See in this regard Recent Decision, 51 CALIF.L.REV. 219, 228 (1963); Note, 76 HARV.L.REV. 75, 145 (1962).

8. See e.g., Heard v. United States, No. 18290, 120 U.S.App.D.C. ——, 348 F.2d 43 (showing of addiction alone insufficient to require Durham-McDonald charge to jury), which rejects the obiter dicta observations of Brown v. United States, 118 U.S.App.D.C. 76, 331 F.2d 822, 823 (1964), and Castle v. United States, No. 17894, 120 U.S.App.D.C. ——, 347 F.2d 492.

ment fixed by Congress is cruel and unusual because it provides imprisonment for those unfortunates who surrender to the appetite for drugs.

BAZELON, Chief Judge (concurring in part and dissenting in part):

## I. *Sham Arrest*

Appellant says that his arrest for drinking in public was a sham to cover for a narcotics search and hence the twenty-eight capsules of heroin-hydrochloride mixture found on his person should have been suppressed at his trial for Harrison Act violations.

The record lends some support to his contention. He was arrested by a narcotics squad officer in plain clothes, who testified that he was on watch for narcotics activity, in a high narcotics density area; he neither looked for persons drinking in public nor ordinarily arrested persons committing that offense in his presence; from the moment that he saw appellant walking on V Street he suspected narcotics activity, and therefore followed appellant; he recognized appellant as a prior narcotics offender before arresting him for the misdemeanor. Appellant stated, without contradiction, that other men in the alley were drinking, but were not even approached by the officer.

On the other hand, there is support for the view that the arrest was not a sham. Appellant violated a city ordinance in the immediate presence of a police officer, who would have committed a misdemeanor had he failed to arrest. D.C.Code § 4–143. Upon the officer's inquiry, appellant stated he was carrying a weapon. When the officer halted appellant from reaching for it and looked for himself, he discovered the narcotics. Neither appellant's illegal behavior nor his reaction when asked about weapons is in any way attributable to the officer.

A defendant is not foreclosed from questioning the motives behind a legal arrest which leads to the discovery of evidence of other crimes. Notwithstanding such statutes as D.C.Code § 4–143, police exercise substantial discretion in arresting persons for commission of minor offenses such as drinking in public [1] When a minor misdemeanor statute is enforced only as a gamble for detecting a larger crime, this discretion is abused.[2] To discourage such gambles, the evidence thus obtained is excluded.[3] Thus in McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977 (1950), the defendant was legally arrested for lottery violations. However, the police "purposely refrained from arresting him in the street," as they might have, so as to be able to conduct a search of the premises they expected to enter. The fruits of this search were excluded. In White v United States, 106 U.S.App.D.C. 246, 271 F.2d 829 (1959), defendant was arrested in New York for vagrancy and the police used the occasion, as they conceded to be their practice, to search for narcotics.

---

1. See Goldstein, *Police Discretion Not to Invoke the Criminal Process: Low Visibility Decisions in the Administration of Justice*, 69 YALE L.J. 543 (1960).

Some have argued that, in many respects, this discretion is salutary. "If every policeman, every prosecutor, every court, and every post-sentence agency performed his or its responsibility in strict accordance with rules of law, precisely and narrowly laid down, the criminal law would be ordered but intolerable." Breitel, *Controls in Criminal Law Enforcement*, 27 U.CHI.L.REV. 427 (1960). But see Goldstein, *supra*. And the limited resources allocated to police agencies may compel such choices as a practical matter.

2. "If it is necessary to * * * legalize arrest for mere suspicion, then the grave policy and constitutional problems posed by such suggestions should be faced. If present restrictions on the laws of attempts or arrest place too onerous a burden upon the police because of the nature of modern crime, then such propositions should be discussed and resolved on their merits * * *." Foote, *Vagrancy-Type Law and Its Administration*, 104 U.PA.L. REV. 603, 649 (1956).

3. Compare Culombe v. Connecticut, 367 U.S. 568, 632, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.); Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

We assumed the legality of the arrest, but excluded the evidence obtained there because the "search * * * in truth was not incidental to an arrest, but * * in fact the arrest was incidental to [the] search." (*Id.* 106 U.S.App.D.C. at 248, 271 F.2d at 831.) See also Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961).

Although the present case is close on the sham arrest issue, the record does not justify reversal. Much of the force of the contention that appellant's arrest was "merely" for drinking in public would have been destroyed had it been clearly established that other men in the alley were drinking. It would appear that defense counsel was aware of this, yet the officer, who admitted that others were there, was never asked—and did not say—if they were drinking. Appellant's version of the arrest, although it generally coincided with that of the officer, could be disbelieved on this point. The issue was one for inference to be drawn by the fact-finder based upon credibility and demeanor. For that reason alone, I would sustain the ruling below.

## II. *Equal Protection*

The "sham arrest" issue is not the only aspect of police and prosecutorial discretion in this case. Appellant claims that a denial of equal protection results from prosecutorial discretion to proceed under the Federal narcotic laws, rather than the equally applicable provisions of the District of Columbia Code. As I have previously noted,[4] this claim has substantial merit. We may not reject it merely on the unelaborated judgment of affirmance in Lloyd v. United States, No.

18049, decided July 3, 1964, 119 U.S.App. D.C. ——, 343 F.2d 242.

The problem is perhaps best illustrated by appellant's first conviction for narcotics offenses in 1956. On arrest, under circumstances not disclosed by the record, he was found to possess one capsule of heroin-hydrochloride mixture[5] and nine marijuana cigarets. The arresting officer was a member of the narcotics squad of the Metropolitan Police, with statutory responsibilities to enforce both Federal narcotics statutes and the District of Columbia Code. He charged appellant with violation of the two Federal statutes which have generally been applied against possessors of heroin,[6] plus the Federal statute applying to improper possession of marijuana.[7] Appellant was indicted under all three statutes. He subsequently pled guilty to one of the heroin counts.

Appellant could have been charged with violation of D.C.Code § 33-402(a), which renders it "unlawful for any person to * * * possess * * * any narcotic drug, except as authorized * * *." As a first offender, he could then have been fined from $100 to $1,000, or imprisoned for up to one year, or both.[8] Or he might have been prosecuted solely under 26 U.S.C. § 4704(a), a Federal provision which outlaws purchase or sale of narcotics except from original packages with an authorizing tax stamp, and, since 1956, punishes first offenders by imprisonment of two to ten years, with an optional fine of up to $20,000; first offender sentences under this provision can be suspended, and probation granted. Or he might have been prose-

---

4. Dissent from denial of rehearing *en banc*, Lloyd v. United States, No. 18049, Nov. 6, 1964, 119 U.S.App.D.C. ——, ——, 343 F.2d 242, 246.

5. It allegedly contained 0.8 grains (.002 oz.) of the mixture. (See note 21 *infra.*) While the percentage of heroin was not alleged, a high percentage would be unusual. Ploscowe, *Some Basic Problems in Drug Addiction and Suggestions for Research*, in DRUG ADDICTION: CRIME OR DISEASE 26 (Report, Joint Committee of the American Bar Associa-

tion and the American Medical Association on Narcotic Drugs, 1961).

6. 21 U.S.C. § 174, 26 U.S.C. § 4704(a).

7. 26 U.S.C. § 4744(a).

8. These provisions are derived from the Uniform Narcotics Act, in force in 47 states and all United States territories, and enacted for the District in 1938. Conviction under this Act does not count as a prior conviction for purposes of the multiple offender provisions of the Federal narcotic laws.

cuted under 21 U.S.C. § 174, which prohibits unlawful dealings in imported drugs, but can be applied to addict-possessors; it punishes first offenders by fine of up to $20,000 and imprisonment for five to twenty years, without possibility of suspension of sentence or probation, 26 U.S.C. § 7237(d).

Thus, although the Federal and District statutes cannot be said to create different grades of crime,[9] the choice of the former decided that appellant was to be tried for a felony rather than a misdemeanor, and subjected to a minimum mandatory sentence. By invoking *both* Federal statutes, the prosecutor foreclosed a suspended or probationary sentence under § 4704(a) and added three years to the mandatory minimum sentence.

Hutcherson's present appeal is from his third conviction for Federal narcotic offenses.[10] Both 26 U.S.C. § 4704(a) and 21 U.S.C. § 174 punish a third offender by fine of up to $20,000 and imprisonment for ten to forty years, without possibility of probation or suspension of sentence.[11] Multiple offenders under the D.C.Code, however, are punishable only by fine of $500 to $5,000 and/or imprisonment for any term up to ten years. D.C.Code § 33–423. Suspension of sentence and probation are possible.

In Berra v. United States,[12] where the question was prosecutorial choice between two tax statutes, a majority of the Supreme Court explicitly refused to reach the issue whether such discretion was constitutionally permissible. In that case, choice was between one statute treating the offense as a misdemeanor[13] and another treating it as a felony,[14] but with no mandatory minimum sentence.

In a compelling dissent, Mr. Justice Black remarked:

"So far as I know, this Court has never approved the argument the Government makes here. \* \* \* [That] argument rests on the stark premise that Congress has left to the district attorney or the Attorney General the power to say whether the judge and jury must punish identical conduct as a felony or as a misdemeanor.

"A basic principle of our criminal law is that the Government only prosecutes people for crimes under statutes passed by Congress which fairly and clearly define the conduct made criminal and the punishment which can be administered. This basic principle is flouted if either of these statutes can be selected as the controlling law at the whim of the prosecuting attorney or the Attorney General. \* \* \*

"\* \* \* Of course it is true that under our system Congress may vest the judge and jury with broad power to say how much punishment shall be imposed for a particular offense. But it is quite different to vest such powers in a prosecuting attorney. \* \* \*

"The Government's contention here also challeng[ed] our concept that all people must be treated alike under the law. \* \* \*" [351 U.S. at 138–140, 76 S.Ct. at 690–691.]

The choice between felony and misdemeanor in *Berra* did not have as serious consequences as the choice involved in the instant case. On conviction for the felony charge in *Berra*, the trial judge

---

9. See my dissent from denial of rehearing in Lloyd v. United States, note 4 *supra*.

10. Hutcherson's second conviction, in 1959, arose from charges that he sold two capsules of heroin-hydrochloride mixture to an undercover agent, on each of two occasions.

11. 26 U.S.C. § 7237. Second offenses under 26 U.S.C. § 4704(a) are treated differently from second offenses under 21

U.S.C. § 174: both have an optional fine of up to $20,000; but § 4704(a) carries a mandatory minimum of five years, with maximum of twenty, while violation of § 174 is punishable by imprisonment for ten to forty years.

12. 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956).

13. 26 U.S.C. § 7207.

14. 26 U.S.C. § 7201.

could have imposed the penalties provided by the misdemeanor statute if he was convinced that the prosecutor was mistaken in charging a felony. Here, however, prosecution under Federal rather than District narcotics law precluded any sentence less than ten years. No correction of a prosecutorial "mistake" would be possible. When the prosecutor "chooses" a mandatory minimum sentence, he makes a sentencing decision, without either sentencing information or expertise in sentencing.

This sentencing aspect of the prosecutor's choice distinguishes the prior cases [15] and is the strongest support for the equal protection argument.[16] Yet it cannot be said that the District statute must prevail over the Federal. While it is doubtful that Congress carefully considered their reconciliation when the District statute was passed,[17] its subsequent actions [18] suggest that the District provisions are distinctly subsidiary to the Federal. Moreover, the Federal statute is of national application, and has been enforced here and elsewhere for over fifty years. Compelling the United States Attorney for the District to prosecute under the local act would hardly resolve the matter since, for example, minor offenses committed in Maryland and Virginia could still be prosecuted under Federal authority.

Nor can statutory overlap be avoided by specifying the quantities of narcotics which would justify prosecution under one or another of the statutes. Congress provided no basis for distinguishing between "local" and "national" drug crime. The indications are that it considered all such crime a matter of Federal significance. Quantitative lines are questionable even as between 26 U.S.C. § 4704(a) and 21 U.S.C. § 174, where there is evidence of congressional intent to make "a distinction * * * between the possessors and traffickers." [19] For Congress plainly intended to overcome the inherent difficulties of detection and proof of narcotics violation by invoking presumptions

---

15. For example, in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L. Ed. 306 (1932); Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); and Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed. 2d 597 (1959), the Supreme Court decided only that the prosecutor could multiply counts in narcotics cases, so as to *make possible* longer sentences if consecutive terms were imposed. Here the choice *forecloses* the judge from imposing a lesser sentence. Compare State v. Pirkey, 203 Or. 697, 281 P.2d 698 (1955) (prosecutorial choice), with State v. Boggs, 57 Wash.2d 484, 358 P.2d 124 (1961) (sentence of one day to ninety-nine years possible).

The sentencing aspect also makes plain that appellant has standing as a "person aggrieved."

16. Those State courts applying doctrines of equal protection to criminal prosecutions have stressed just this factor as central to their rationale. State v. Pirkey, 203 Or. 697, 281 P.2d 698, 702 (1955); State v. McDonald, 231 Or. 24, 361 P.2d 1001 (1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1247, 8 L.Ed.2d 399 (1962); Olsen v. Delmore, 48 Wash.2d 545, 295 P.2d 324 (1956); State v. Twitchell, 8 Utah 2d 314, 333 P.2d 1075 (1959).

17. The provision of the District statute, forbidding prosecution for an offense already tried under Federal law, did not originate with Congress but with the Uniform Narcotics Act. D.C.Code § 33–424.

18. While sentencing disparities have existed since passage of the D. C. act, they have been greatly increased since. The District act's penalties have not been changed in sixteen years, while those of the Federal acts were increased markedly in 1951 and 1956. At the same time, provisions were written into the Federal acts expressly recognizing the enforcement role of the District police. 18 U. S.C. § 1405.

19. Remarks of Rep. Cooper, floor manager of the bill in the House, 102 Cong.Rec. 10688 (June 20, 1956). See also H.REP. No. 2388, 84th Cong., 2d Sess. 2, 4, 5, 10–12, 64–65 (1956); S.REP.No. 1997, 84th Cong., 2d Sess. 5–6 (1956); H.REP. No. 2546, 84th Cong., 2d Sess. 13 (Conference Report 1956) U.S.Code Congressional and Administrative News, p. 3274.

arising from possession alone.[20] Moreover, quantitative distinctions may encourage peddlers to carry "one grain less" than the operative amount.[21]

Thus I agree that this prosecutorial discretion is inevitable. But this discretion is not unbridled. Decisions must be made by proper authority upon a rational basis with due regard to statutory meaning and intent.

Recent instructions from the Attorney General relating to prosecutorial decisions in narcotic cases suggest that the United States Attorney does have certain administrative guidelines for his choice. Thus Title 2, § 86.2—86.3 of the United States Attorney's Manual provides:

"The principal object of enforcement is * * * to prosecute the importers, dealers and traffickers * * *. The emphasis should be on prosecutions of the sellers or purveyors, particularly those who deal with minors, *and not the mere addict possessors.* * * * [C]riminal prosecutions of [addicts] in some instances may be justified so as *to compel an addict to undergo complete [rehabilitative] treatment.* * * * [P]rosecutions for such minor offenses which are considered to be local in character may well be and often are left to the state or local authorities.* Not falling within such minor category are cases against persons, whether addicts or not, who engage in the importation or transportation or are in possession of these drugs under circum-

stances reasonably indicating that the drugs were intended for use in the illegal traffic. * * *

"In prosecutions for *serious* offenses by *traffickers* * * * *two* counts may be charged, one under the internal revenue laws and the other under [21 U.S.C. § 174]." [Emphasis supplied.]

More recently, a letter from the head of the Criminal Division of the Department of Justice commented:

"During the White House Conference [on Narcotic and Drug Abuse] one panelist (a Federal judge) said there was a reluctance on the part of United States Attorneys to use Section 4704 * * * of Title 26 for first offenders. Under [§ 4704] first offenders are eligible for suspension of sentence, probation and parole. * * * [I]n the United States Attorneys' Bulletin, Volume 10, Number 25, December 14, 1962 * * * the Department advised that its review revealed excessive use of [21 U.S.C. § 174]. Current examination indicates no appreciable decrease * * *.

"In any case where a person, not previously convicted of any felony, is charged with violating the federal laws relating to narcotics * * * and * * * § 4704 * * * of Title 26 is applicable to the offense, that Section shall be used exclusively unless clearance to prosecute under other applicable sections is received from the Criminal Division.

---

**20.** Congress failed to accompany the change in penalties with amendment of 21 U.S.C. § 174. As a consequence, it is still possible to bring addict possessors within the language of that Section and indictments under it are still the order of the day. Text at note 22 *infra.* See United States v. Garnes, 258 F.2d 530 (2d Cir. 1958); State v. Reed, 34 N.J. 554, 170 A.2d 419, 91 A.L.R.2d 797 (1961), reversing, 62 N.J.Super. 303, 162 A.2d 873 (1960). But compare United States v. Stever, 222 U.S. 167, 32 S.Ct. 51, 56 L.Ed. 145 (1911); United States v. Gainey, 85 S.Ct. 754; State v. Popiel,

216 Or. 140, 337 P.2d 303 (1959); State v. Harmon, 225 Or. 571, 358 P.2d 1048 (1961).

**21.** Eldridge, NARCOTICS AND THE LAW 52–56 (1962); compare New York statutes, enacted in 1956, which discriminate among possessors of large amounts of drugs (one or more ounces of a mixture containing one percent or better of heroin, morphine or cocaine), moderate amounts (one eighth of an ounce or more), and minor amounts, NEW YORK PENAL LAW, McKinney's Consol.Laws, c. 40 § 1751.

" \* \* \* [A]uthorization should be requested in writing, setting forth in some detail the reasons for such request." [22]

The Bulletin referred to is to the same effect.

These instructions may provide a suitable framework for structuring prosecutorial choice. The reference in the first instructions above to "minor offenses which are considered to be local in character" suggests use of the "local" or District statute in the absence of special circumstances. The instructions for choosing between 26 U.S.C. § 4704(a) and the other Federal provisions are more definite. The Department appears to be invoking its power to "direct all United States attorneys \* \* \* in the

discharge of their \* \* \* duties." 28 U.S.C. § 507(b).

We are not advised, however, of the extent to which these instructions are followed,[23] and of the extent to which the narcotics squad of the Metropolitan Police Department influences the choice.[24] We do not know how the United States Attorney's allocation of cases between the Federal and local statutes compares with that found in other jurisdictions, where local and Federal laws are enforced by different authority.[24a] We do not know whether information outside the record would show that the offense here was of greater importance than appears from the record.[25]

I think it would have been open to defendant to attempt to show abuse of

---

22. Letter to United States Attorneys from Herbert J. Miller, Jr., dated August 3, 1964.

23. Both the pattern of cases before this court and the Department of Justice's comments suggest that 21 U.S.C. § 174 is rarely omitted from a narcotic indictment arising from possession. The question arises whether this occurs because its heavier penalties act as an inducement for guilty pleas under the lesser penalty statutes.

24. It would appear from our experience that narcotics squad policemen usually specify the violations to be charged and invoke the Federal statutes even where possession of but a small amount of drugs is involved. How this affects prosecutorial discretion is unclear. Delegation of this prosecutorial discretion to police may be questionable.

24a. Appellant's petition for rehearing *en banc* cites a recent report by the Commissioner of Narcotics that:

"it is not the policy of the Bureau of Narcotics to advocate jail treatment of drug addicts and that its enforcement activity is directed toward the illicit trafficker. [The Commissioner] stressed the fact that ' \* \* \* the Bureau does not concentrate its efforts on making possession-type cases against narcotic addicts. The enforcement effort of the Bureau is directed against the international and the interstate traffickers. In fact, 85 to 90 percent of the defendants prosecuted in the U. S. district courts for narcotic violations involve the il-

legal sale or smuggling of narcotics. Of the remaining 10 to 15 percent of cases which involve possession of narcotics, the quantities indicate clearly that the defendant is a trafficker and not merely an addict in possession of his own supply \* \* \*.' Hearings Before the Permanent Subcommittee on Investigations of the Senate Comm. on Government Operations, 88th Cong., 2d Sess. Pt. 3, p. 836 (1964)."

Outside the District of Columbia, the Bureau is the principal source of prosecutions under the federal statute.

On the basis of cases reaching this court, I think there is a serious question whether the United States Attorney and the Metropolitan Police Department follow a similar enforcement policy. It would not appear, for example, that the Commissioner's statement that over sixty percent of the persons prosecuted on the basis of Bureau investigation are not addicts, *id.* at 809, is applicable in the District, where addict defendants seem to be the rule rather than the exception. Since addiction among traffickers is found only at low levels in the chain of supply, President's Advisory Commission on Narcotic & Drug Abuse, FINAL REPORT 40 (1964), a low proportion of non-addict prosecutions could indicate that enforcement activity is not effectively directed toward the illicit traffickers. In the absence of more statistical data, of course, it is not possible to be certain of this.

25. See my dissent in Lloyd v. United States, note 4 *supra*, 119 U.S.App.D.C. ——, ——, 343 F.2d 242, 246, 247.

prosecutorial discretion on a pretrial motion to dismiss the indictment. Although appellant did not directly seek such relief below, he did challenge the sufficiency of the indictment at trial by eliciting from Government witnesses admissions that they had no direct knowledge of any violation of the Federal statutes; they knew only of appellant's possession, which was presumptive of violation. I would construe this challenge as sufficient to raise the issue, and remand for plenary hearing on the indictment.

## III. *Cruel and Unusual Punishment*

Appellant argues for the first time on appeal that Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed. 2d 758 (1962), bars punishment for possession and concealment of narcotics. The argument is not that the penalty inflicted is too harsh for the alleged crime. Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). Rather, it is that the acts could not constitutionally be considered a crime, subject to criminal punishment of any nature, when performed by a drug addict wholly because of his drug addiction. *Robinson* held that it was cruel and unusual to punish an addict for his addiction; addiction was characterized as a diseased state which could not be considered a crime. Appellant states that there is no meaningful difference between the punishment of an addict for being an addict and the punishment of an addict for possessing the drugs his body compellingly craves.

However, as this court recently stated, the *Robinson* argument, "although neither remote nor insubstantial, is one which, in the light of the great weight of the cases which have imposed such punishment, is more properly to be made to the Supreme Court." Castle v. United States, No. 17894, 120 U.S.App.D.C. ——, 347 F.2d 492. The Supreme Court did not bar punishment for possession of drugs, use of drugs, or even the act of being under the influence of drugs.[26] On the other hand, its references to the continued permissibility of punishing use, possession, etc, could hardly be taken to approve the punishment of persons not responsible for their conduct.[27] Thus the Supreme Court stressed its view that addiction may occur "involuntarily" or "innocently." Moreover, state court reluctance to extend *Robinson* seems to rest on a conclusive presumption of responsibility. For example, the New Jersey Supreme Court recently said:

" * * * being under the influence of a drug is itself antisocial behavior. It is not some latent or passive proclivity; it is an active state, *voluntarily induced* and laden with a present capacity for further injury to society. * * * Robinson is not to the contrary." [State v. Margo, 40 N.J. 188, 191 A.2d 43, 45 (1963) (emphasis supplied).]

This unexamined assertion of voluntariness is the linchpin of the court's rationale.[28]

Indeed, the question of responsibility is the heart of the addict's argument that he should not be punished for posses-

26. 370 U.S. at 664–665, 82 S.Ct. 1417.
   *Robinson* has been narrowly read. *E.g.*, State v. Margo, 40 N.J. 188, 191 A.2d 43 (1963); In re De La O, 59 Cal. 2d 128, 28 Cal.Rptr. 489, 378 P.2d 793, cert. denied, 374 U.S. 856, 83 S.Ct. 1927, 10 L.Ed.2d 1076 (1963); State of Louisiana, ex rel. Blouin v. Walker, 244 La. 699, 154 So.2d 368 (1963), cert. denied sub nom. Watkins v. Walker, 375 U.S. 988, 84 S.Ct. 96, 11 L.Ed.2d 45 (1964); Salas v. State of Texas, Tex. Cr.App., 365 S.W.2d 174, appeal dismissed, 375 U.S. 15, 84 S.Ct. 96, 11 L.Ed.2d 45 (1963). Compare People v. Davis, 27

Ill.2d 57, 188 N.E.2d 225 (1963); State of Missouri v. Bridges, 360 S.W.2d 648 (Mo.1962), where *Robinson* was followed.

27. It seems to me that the failure to consider this obvious truth explains a California District Court of Appeals rejection of the *Robinson* rationale suggested here. People v. Zapata, 34 Cal.Rptr. 171, 220 Cal.App.2d 903 (1963) appeal dismissed, 377 U.S. 406, 84 S.Ct. 1633, 12 L.Ed.2d 495 (1964).

28. See also People v. Ayala, 167 Cal.App. 2d 49, 334 P.2d 61 (1959).

sion.[29] Addicts have frequently been successful in this jurisdiction in raising the insanity defense.[30]   Other theories to excuse responsibility, such as "pharmacological duress," have also been advanced.   [See, *e. g.,* Castle v. United States, No. 17894, decided Nov. 19, 1964.] I submit that *Robinson* requires serious consideration of these claims as matters affecting responsibility.   But I am constrained to agree that we cannot consider these claims now since they were not advanced below and no evidence was offered to show that here possession was compelled by addiction.

**29.** Compare Durham v. United States, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876, 45 A.L.R.2d 1430 (1954); United States v. Currens, 290 F.2d 751, 753 (3d Cir. 1961).

**30.** United States v. Prince, D.D.C.Crim. No. 349–63 (March 17, 1963); United States v. Bell, D.D.C.Crim.No. 969–61 (May 22, 1962); United States v. Purcell, D.D.C.Crim.No. 487–62 (Jan. 14, 1963); United States v. Wallace Carroll, D.D.C.Crim.No. 383–62 (June 28, 1962).